ALBERT W. HILL v. STATE OF NEBRASKA.

FILED OCTOBER 21, 1927.   No. 25810.

*Allen G. Fisher* and *Samuel L. O'Brien,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before GOSS, C. J., DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DEAN, J.

August 30, 1926, Albert W. Hill, defendant, was informed against by the county attorney in and for Sheridan county and there charged with having unlawfully and maliciously shot Neil O'Blenness with a shotgun, on July 20, 1926, and

that, from the wounds so inflicted, Neil O'Blenness instantly died. The jury found the defendant guilty of murder in the first degree and fixed the penalty at imprisonment for life. Defendant prosecutes error.

The defendant is 41 and his wife is 34 years of age. Their home has been in Sheridan county about 8 miles south of Gordon since 1915, and elsewhere in the same county ever since 1909, when defendant there homesteaded a tract of land. O'Blenness was a young unmarried man, athletic, congenial and of fine appearance. At his death he was 21 or 22 years of age and for about a year before the defendant's encounter with him he worked as a hired man on defendant's ranch. The record discloses that the defendant suspected O'Blenness of having disturbed his marital relations. It was solely out of this suspicion that the trouble arose, out of which O'Blenness lost his life.

In defendant's brief it is argued that he "was not jealous in the least." But the argument does not appeal to us. It does not appear to fit the fact. One of the witnesses testified that, when he asked the defendant if he had ever found his wife and Neil in a compromising position, he replied: "No; that is the hell of it; they were too slick for me." To another witness the defendant said he "had never seen or caught them in any compromising position, and didn't that evening."

The record throughout goes to show that jealousy was the motive that actuated the defendant in his murderous assault upon O'Blenness. And it is explicitly disclosed that this was the only trouble they ever had. Whether O'Blenness was guilty of improper conduct with the defendant's wife is not, of course, the question that is before us, other than as it serves, if it may, to point out the motive for the commission of the murder with which the defendant is charged. The vitally important point in this suit for the jury to determine from the evidence was whether O'Blenness was armed at the time of the shooting or whether the defendant had reasonable grounds to believe that he was armed.

The substance of the defendant's material evidence, in respect .of the efforts he made to detect the supposed infidelity of his wife, so as to verify his suspicions, is outlined in the discussion of the evidence which follows:

It appears from the defendant's evidence that, in the afternoon of July 20, 1926, he left the ranch house in his car and drove a mile or two away into a pasture field, and there he left his car in a secluded spot where it could not be seen from any highway. But before he left the ranch house he deceptively told his folks that he would not return until late at night or perhaps in the early morning. He testified:

"I swung over in that pasture and left my car and come back to the house and got in the granary. I wanted to see what I could see. And about 5 o'clock my little nephew had been sledding corn, and he came to the house with his team, and drove up to the north window and says to somebody in the house, he says, 'Is Uncle Albert (defendant) gone?' "

After putting his team away this young nephew went to the house and got some smoking tobacco from Mrs. Hill, as requested by O'Blenness, and took it to him in the field, and soon afterward the nephew and O'Blenness returned to the farm yard together, and O'Blenness, after putting his team in the stable, went into the house. At this time the defendant's wife and her mother were both in the yard, but shortly afterward his wife also went into the house. The defendant testified that, as his wife approached the house, O'Blenness opened the door for her and closed it when she entered. Soon afterward defendant saw a red dress that his wife had been wearing "flash through the window," and this appeared to him to be a circumstance so suspicious that he left his hiding place in the granary, and, going up to the house, he discovered that his wife "was practically standing in the bedroom door; she was just coming out," and O'Blenness came out right behind her. The defendant then promptly struck his wife in the face with his clenched fist and he said the blow gave her a black

eye. A fist fight then began between O'Blenness and the defendant, in which the defendant said he did not know which of the belligerents got the worst of it, but his wife testified that her husband got the worst of it. After the fight was over the defendant told O'Blenness "to get off the place and stay off;" to which O'Blenness rudely replied that "he would go when he got d——n good and ready;" and then, according to the defendant's evidence, he said, "I'll get you," and started toward the pantry. The defendant testified that he knew O'Blenness had a gun in the pantry, and he then went to the garage and got his shotgun and returned toward the ranch house; that O'Blenness came around the house with a gun in his hand, and that he, the defendant, "pulled up like this and shot." The defendant further testified:

"He run when I shot him, and I didn't know, when I shot him I couldn't tell where I hit him or not, he didn't stumble or flinch or anything, and I couldn't tell whether any shot actually hit him, and I stood there for a second, and then walked around the south side of the house to see where he was, and he was out here towards this corncrib, before he crawled over the fence, and he pointed the gun again at me, like that (indicating), and when I pulled up he kind of turned sideways to me, and I shot again at him then; and he jumped over the fence, and I thought he was going, but he turned round again and acted like he was going to shoot, so I up and shot him again. When he seen I was going to shoot again, he turned and acted like he was going to run, and I shot him the third time and he throwed up his hands and hollered, 'Oh!' And I turned and walked back out towards the hen-house where my wife and her mother was, to explain it to her, to try to pacify her. I never saw O'Blenness fall."

The defendant testified in respect of the manner in which he disposed of the body of O'Blenness. It appears that he waited until far into the nighttime and that he then drove to the place where the slain man lay and alone he loaded the body into his car and, at the hour of midnight,

he drove to an isolated spot in a pasture field about six miles from the place where O'Blenness fell and there he dug a shallow trench in the sand and into this opening he threw the body of the dead man and covered it over with sand. Several days afterward, upon the request of some of his neighbors, to whom he had related the facts, and of certain of the county officers, he voluntarily went with them to the place of O'Blenness' burial and the body was exhumed.

Defendant's wife testified that when her husband came from the granary to the house, as he testified, she was coming out of the door, and that defendant immediately said: "What are you doing?" And that he then struck and pushed her about, and when the men began the fight, above referred to, she ran away and saw no more of it. When her husband found that Neil was dead, according to her evidence, he brought his hat and his revolver into the house, but whether it was the revolver in evidence she did not know, but testified that it looked like it. Nor did she know what her husband did with it. On the cross-examination by the state, she testified that, on the evening of the tragedy, O'Blenness embraced her. And the state inquired: "Q. And what were you doing? Were you consenting to it? A. No. Q. Well, what were you doing, then? A. I was pushing him away; and I got out of the bedroom." On the recross-examination she testified: "Q. Now, had O'Blenness ever tried to embrace you before? A. Yes. Q. You were on friendly terms with him, weren't you? A. Yes." She further testified that O'Blenness was kind-hearted and never came into the house without talking awhile with her or her mother, but that they were nothing more than friends. This was the sum of her evidence in respect of O'Blenness' conduct toward her.

Did Neil O'Blenness have a gun in his hand at the time of the tragedy, as the defendant testified? Or did the defendant have reasonable grounds to believe that O'Blenness then had a gun in his hand? This vitally important inquiry was fairly put up to the jury for its determination

under the court's instructions which correctly stated the law applicable to the fact. After O'Blenness received the first shot just as he turned and fled, would the jury have been justified in the belief that O'Blenness, had he been armed, would have taken at least one shot or perhaps more than one at his assailant? In view of the verdict this, under the evidence and the court's instructions, must have been the jury's view of this important feature. The defendant himself testified that he fired his shotgun three times at O'Blenness. And it plainly appears from his evidence that he fell, mortally wounded, when he was struck by the third shot. He further testified that, as soon as he fired the first shot, O'Blenness turned and ran away from him, and that he continued to run until the last shot was fired. In fact, O'Blenness ran so fast from his assailant that he was not sure for some time whether the last shot had killed him. And, incidentally, it may be observed that neither the defendant nor any other witness testified that O'Blenness fired a single shot at the defendant. But, on the contrary, there is the evidence of three disinterested witnesses, and this is presently discussed somewhat in detail, who testified that the defendant talked severally to them within a day or two after the shooting, and informed them that O'Blenness was not armed and that he began to run away as soon as he fired the first shot, and that he continued to run until the last shot was fired, when he fell.

One of the three witnesses to whom the defendant freely talked the second day after the tragedy was called as a witness by the state, and he testified on the direct examination that the defendant told him that, just before he fired the first shot, "Neil came out of the house and started towards the barn, and just as Neil turned his head to look at him, he shot. Q. Now, just a minute: Did he (defendant) say anything about Neil having anything in his hands? A. I asked him if Neil had anything in his hands, and he said, 'No; he didn't have anything in his hands; he (O'Blenness) didn't think he needed it; he thought he had me

bluffed.' " This witness, having joined in a search of defendant's premises, a day or two after the shooting, further testified:

"Q. Did you make any search there for any other weapons that night? A. No; 1 didn't make any search at all; but Mr. Hill voluntarily handed me a gun that he got up on a shelf in the pantry, a small revolver, that he said belonged to Neil O'Blenness. Q. And what did he say about the gun? A. 1 asked him if there was any shells for it, and he said, 'No; there wasn't any shells; hadn't been any shells.' Q. Have you that gun in your possession yet? A. 1 turned the gun over to the sheriff." The shotgun and revolver are with the record.

Another state witness testified on the direct examination that he talked with the defendant a few days after the tragedy, and that he said to him: "Well, Neil was a small man, couldn't you handle him? And he said, 'No; I could in my younger days;' he said, 'We had a pretty hard fight and I ordered him off the place.' " This witness testified that defendant told him that after O'Blenness fell he " 'turned round and went back where my wife and mother-in-law was,' and his mother-in-law said something about not shooting, there was to be no shooting around there, and he said, 'I wanted to explain everything to her mother, and my wife got up and denied everything that I said, and her mother, at first, wouldn't believe me, but I finally convinced her mother that Neil was crooked and hardboiled.' And he said, 'I wanted to show Neil that I was just as hardboiled as he was.' "

In respect of the comparative prowess of the defendant and O'Blenness as fighting men, the defendant elsewhere in the record testified that he weighed about 145 pounds, and that O'Blenness weighed 165 or 170 pounds, and that "he was the best guy on his feet I have ever seen."

A witness for the state testified on the direct examination that the defendant told him that, when he picked up his shotgun, Neil's hands were empty, and that "he didn't have anything in his hands, and just before he shot he said Neil

O'Blenness was heading around when he shot him," and that he, the defendant, "wanted to show Neil that there was guys just as tough in this world as he was; that if there was anything wrong his wife was to blame, and if there wasn't he (defendant) ought to be in prison for shooting him." This witness saw O'Blenness' body at the undertaker's, about a week after he was killed. and he testified that "he was pretty well plastered with shot. The main charge looked like it took him right around the heart," and there were a good many shots in his back. And another witness testified:

"Q. In your conversation with Mr. Hill at his home the evening you were down there, did he say anything about whether or not O'Blenness had anything in his hands when he shot him with the shotgun? A. He said he was headed for the barn, apparently to take care of his team, and he apparently had nothing with him."

The witnesses, in respect of the defendant's statements which were made to them, severally testified that they were voluntarily made by defendant, and that they were not induced by threats nor by promises of leniency in respect of lawful punishment.

The defendant contends that he was not arraigned nor did he plead, and that error was thereby committed. In view of chapter 105, Laws 1925, reversible error cannot be predicated on this assignment. Chapter 105 follows:

"The accused shall be arraigned by reading to him the indictment, unless, the reading shall be waived by the accused, by the nature of the charge being made known to him, and he shall then be asked whether he is guilty or not guilty of the offense charged. If the accused appear in person and by counsel and goes to trial before a jury regularly impaneled and sworn he shall be deemed to have waived arraignment, and plea of not guilty deemed to have been pleaded." Section 10117, Comp. St. 1922, as amended by chapter 105, Laws 1925.

Defendant requested the court to give the following instruction:

"You are instructed that in weighing the testimony greater care should be used in relation to the testimony of persons who are interested in, or employed to find, evidence against the accused than in other cases, because of the natural and unavoidable tendency and bias of mind of such persons to construe as evidence against the accused, and disregard everything which does not tend to support their preconceived opinions of the matter in which they are engaged."

We do not think the requested instruction is applicable to the facts. And it is well settled that the caution that is to be observed in weighing the testimony of persons "who are interested in, or employed to find, evidence against the accused," depends largely on the facts and circumstances of the individual case, and rests largely in the discretion of the trial court. The presumption will not, of course, be indulged that the evidence of the county judge and of the sheriff was biased until the contrary is shown. 16 C. J. 1014. And, besides, there is nothing in the record going to show that any of the witnesses were "employed to find evidence against the accused."

The court, of its own motion, very properly gave this instruction:

"Although you may believe from the evidence that at the time of the homicide in this case the defendant, on account of the friendship existing between his wife and the deceased, was jealous of the deceased, yet such jealousy, or friendship between his wife and the deceased, would constitute no defense and would be no justification for taking the life of the deceased."

The defendant offered and the court refused to give the following instruction:

"You are instructed that deliberation means the act of deliberating or weighing or considering the reasons for or against a choice or measure. In the sense which the word is here used, an act is done deliberately, or with deliberation when it is done in cool blood and not under the influence of violent passion, suddenly aroused by some real or supposed

grievance. A person who does an act, not in the heat of sudden passion, but after having coolly weighed or considered the mode and means of accomplishment, does it deliberately."

In view of the instruction given by the court of its own motion on the subject of deliberation and premeditation, we do not think the defendant can properly take exception to the refusal to give the offered instruction. In the court's instruction, last above referred to, the jury were instructed, *inter alia*, that: "It is sufficient if there was such design and determination to kill distinctly formed in the mind before or at the time the blow is struck or the fatal shot is fired; and in this case, if the jury believe from the evidence, beyond a reasonable doubt, that the defendant feloniously, purposely, and of his deliberate and premeditated malice, shot and killed the deceased in manner and form as charged in the information, and that before or at the time the shots were fired, the defendant had formed in his mind a wilful, malicious, deliberate and premeditated design or purpose to take the life of the deceased, and that the shots were fired in furtherance of that design or purpose, and without any justifiable cause or legal excuse therefor, then the jury should find the defendant guilty of murder in the first degree." We do not think argument is necessary to show the sufficiency of the instruction. The argument for the defense that premeditation and deliberation on the part of the defendant were not shown is not supported by the evidence, and this question, with others pertaining to the facts involved in this case, was properly submitted to the jury for their determination. *Bartlett v. State,* 115 Neb. 148, and cases there cited.

Counsel informed the court that he had three character witnesses, but the court denied the offer of each witness on the ground that it was not shown that they were qualified. Upon examination of the record, we conclude that, in excluding the evidence so tendered, the court did not err, from the fact that it was not shown that the witnesses were qualified to testify in respect of general reputation.

It appears that the defendant signed a written statement wherein some of the facts were connected with the circumstances which attended the killing of O'Blenness were related. The statement was handed to the witness while he was on the witness-stand and he was interrogated in respect of certain material matter contained therein. But in respect of the matter on which he was so interrogated no new material evidence appears to have been developed. Practically all of the material evidence so elicited was a repetition of the evidence of all the persons with whom the defendant had talked within a day or two after the killing and which is hereinbefore set forth. In this view of the fact, reversible error cannot be predicated upon the defendant's examination in respect of matter contained in the written statement.

In a criminal case, where a jury were regularly impaneled and sworn and the defendant failed to plead to the information, and where the court did not enter a plea of "not guilty" in his behalf and the defendant went to trial without being arraigned, and failed to demand a formal arraignment, held, that such defendant waived such right under section 10117, Comp. St. 1922, as amended by chapter 105, Laws 1925.

On the merits, as noted in the opinion, the defendant's argument now contradicts the statement of not less than three disinterested witnesses who testified in respect of statements voluntarily and severally made by him to them shortly after the death of O'Blenness, as to whether O'Blenness was or was not armed when he was killed. But this question, as of all others involved here, was submitted to the jury, under proper instructions, and the jury as triers of fact found against the defendant and for the state. It is elementary that disputed questions of fact, and of the credibility of witnesses as well, are for the jury. *Mathews v. State*, 111 Neb. 593. The record shows that the verdict is amply supported throughout by the evidence submitted on the part of the state, hence it will not be here disturbed by this court.

Defendant complained that the regular panel of the jury was irregularly selected, but he made no motion that the panel be quashed, and he waived his fifth, sixth, and eighth peremptory challenges. It follows that he thereby accepted the jury as being satisfactory to him. Reversible error cannot be predicated on this assignment. "If a party expressly accepts as satisfactory the jury as finally impaneled, he waives any prior objection to the action of the court in overruling a challenge for cause, * * * or irregularity in the selection or impaneling of the jury." 35 C. J. 371, sec. 410.

Other assignments of alleged error are pointed out which we do not find it necessary to consider. The defendant was given a fair and impartial trial. The facts were all fairly presented to the jury and the verdict is amply supported thereby. The judgment is therefore in all things

AFFIRMED.