WILLIAM MAHER, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

13 N. W. 2d 641

FILED MARCH 17, 1944. No. 31647.

464

*Grenville P. North,* for plaintiff in error.

*Walter R. Johnson, Attorney General, Rush C. Clarke* and *H. Emerson Kokjer, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

WENKE, J.

Information was filed in the district court for Douglas county charging William Maher and Tony Scavio with arson in the fourth degree. Upon application of William Maher, the plaintiff in error, he was granted a separate trial. Trial being had he was convicted thereof. In his petition in error, by which he brings his conviction to this court for review, he assigns a very large number of errors as grounds for reversal. For the purpose of this opinion, we will follow the rule as announced in *Mason v. State*, 132 Neb. 7, 270 N. W. 661: "Errors assigned but not argued will be considered as waived."

For the purpose of this opinion the plaintiff in error will be referred to as the defendant and the defendant in error as the state.

The first question presented by this appeal is whether or not the errors relied upon by the defendant are properly here for consideration. The defendant failed to assign in his petition in error that the lower court erred in overruling his motion for new trial. In *Achenbach v. Pollock*, 64 Neb. 436, 90 N. W. 304, we held: "A judgment will not be reversed for errors which are required to be assigned on a motion for a new trial, unless it is alleged in the petition in error and shown by the record that the court erred in overruling such motion." See, also, *Gandy v. Cummins*, 64 Neb. 312, 89 N. W. 777; *James v. Higginbotham*, 60 Neb. 203, 82 N. W. 625. In *Waxham v. Fink*, 86 Neb. 180, 125 N. W. 145, we stated: "Under the former practice it was held, perhaps not necessarily, that the petition in error in this court must contain the assignment that 'the court erred in overruling the motion for a new trial.'" In many of the decisions the reason for this rule is based upon the theory of waiver. This would seem to have little merit for by the ap-

peal itself the appellant shows his dissatisfaction with the ruling on the motion and his attempt to be relieved thereof. As stated in *Reese v. Fife,* 279 S. W. (Mo.) 415: "The appellant has preserved in his motion for new trial the errors of which he complains. To hold that, by failing to also assign error in overruling the motion, appellant has waived the errors preserved for review, would seem to be highly technical. Such an assignment would be superfluous." See, also, *Armour v. Pennsylvania R. Co.,* 353 Ill. 575, 187 N. E. 532. We think the better rule to be that, where the motion for new trial sets forth the errors of which the appellant complains in the manner prescribed by our statute and the assignments in the petition in error are based thereon, then the case is before this court for review and it is not necessary to assign in the petition in error that the trial court erred in overruling the motion for new trial. *Chicago, B. & Q. R. Co. v. Cass County,* 51 Neb. 369, 70 N. W. 955. Therefore, *James v. Higginbotham, supra,* and all other cases in so far as they conflict with the rule herein announced are overruled.

The defendant further contends that section 28-5,101, Comp. St. Supp. 1941, is unconstitutional and therefore void. The basis of this contention is that the act contains more than one subject, that the subject is not clearly expressed in the title, and that it lacks certainty and clearness. Section 14, art. III of our Constitution provides in part: "No bill shall contain more than one subject, and the same shall be clearly expressed in the title." The information under which the defendant was convicted of fourth degree arson is in the language of section 28-5,101, *supra,* which statute is as follows: "Any person who wilfully and maliciously attempts to set fire to or attempts to burn or to aid, counsel or procure the burning of any of the buildings or property mentioned in the foregoing sections, or who commits any act preliminary thereto, or in furtherance thereof, shall be guilty of arson in the fourth degree and upon conviction thereof be sentenced to the Penitentiary for not less than one nor more than two years or fined not

to exceed One Thousand Dollars. The placing or distributing of any inflammable, explosive or combustible material or substance, or any device in any building or property mentioned in the foregoing sections in an arrangement or preparation with intent to eventually wilfully and maliciously set fire to or burn same, or to procure the setting fire to or burning of same shall, for the purpose of this act constitute an attempt to burn such building or property." This is section 4 of Senate File No. 236 as passed by the 1935 session of the legislature appearing as chapter 60 of the 1935 Session Laws. The title to this act is as follows: "An Act relating to crimes and punishments; to define the crime of arson in its various degrees; to provide penalties therefor; and to repeal Sections 28-501, 28-502, 28-503, 28-504 and 28-505, Compiled Statutes of Nebraska, 1929." This act of the legislature includes the various degrees of arson and attempts thereat together with those who aid, counsel or procure the same to be done, including when the same is done to injure or defraud an insurer.

In the construction of this constitutional provision, we stated in *Lennox v. Housing Authority of the City of Omaha,* 137 Neb. 582, 290 N. W. 451: "The constitutional provision does not require that the title be a synopsis of the law. The purpose of the constitutional inhibition was to prevent surreptitious legislation by advising legislators of the nature of the measures they are called upon to support or oppose. If by a fair and reasonable construction the title calls attention to the subject-matter of the bill, it may be said that the object is expressed in the title." And as stated in *Pandolfo v. State,* 120 Neb. 616, 234 N. W. 483: "The provisions of the Constitution relating to titles are to be 'liberally construed, and so construed as to admit of the insertion in a legislative act of all provisions which, though not specifically expressed in the titles, are comprehended within the objects and purposes of the act as expressed in its title; and to admit all provisions which are germane, and not foreign, to the provisions of the act as expressed in its title.' *Affolder v. State,* 51 Neb. 91." And as further stat-

ed in *Birdhead v. State,* 105 Neb. 296, 180 N. W. 583: "A statute which relates to the stealing, buying or concealing of an article is sufficiently broad in its title to cover any act connected with or incidental to the crime, such as attempts to commit it, aiding or abetting the criminal, the protection and concealment of the thief, or the stolen property."

We therefore come to the conclusion that a statute which relates to the various degrees of arson and attempts thereat, together with those who aid, counsel or procure the same to be done, including when the same is done to injure or defraud an insurer, is within the objects and purpose of the act and germane thereto which is described in the title as "to define the crime of arson in its various degrees."

The defendant further contends that the section under which he was convicted was unconstitutional for want of certainty and clearness. Citing from the act hereinbefore set forth the following: "or who commits any act preliminary thereto, or in furtherance thereof, shall be guilty of arson in the fourth degree," the defendant contends the act spreads an all inclusive net for the feet of everybody, upon the chance that, while the innocent will surely be entangled in its meshes, some wrongdoer may also be caught. In a criminal statute what is lawful and what is unlawful should not be left to conjecture. The crime, and its elements, must be clearly expressed so that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue.

In applying the foregoing rule in construing that part of the act of which the defendant complains as lacking certainty and clarity, we must construe it in relation to the entire section of which it is a part. The words "wilfully and maliciously" apply to those "who commit any acts preliminary thereto or in furtherance thereof." The words "thereto" and "thereof" apply to "attempts to set fire to or attempts to burn." When the sentence of which defendant complains is read in relation to the entire act its meaning is certain and clear and we hold it to be constitutional.

The defendant complains of the court overruling his chal-

lenge to the array or motion to quash the jury panel. A defendant in a criminal case is entitled to be tried by a jury summoned and impaneled according to the provisions of the law in force relating thereto. *Michaelson v. Beemer*, 72 Neb. 761, 101 N. W. 1007. The legislature has provided by sections 20-1625 to 20-1640, inclusive, being chapter 20, art. 16, subdiv. (c), Comp. St. 1929, and the amendments thereto as shown by the 1941 supplement, a statutory procedure for the selection and impaneling of juries for a county the size of Douglas. "On a challenge to the array or motion to quash the venire, it will be presumed, in the absence of evidence to the contrary, that the officers charged with the duty of selecting, drawing, and summoning the jury have acted faithfully and according to law, and the burden of showing the contrary is upon the challenging party." 35 C. J. 379, sec. 422. The appellant complains that there was no order of the court directing the original making of the ten key numbers as provided by section 20-1627, Comp. St. 1929. This act provides in part as follows: "The jury commissioner of all counties to which this act may apply, shall in the presence of three judges of the district court of the county, if there be three, if not, then in the presence of such number as there may be, within ten (10) days after the taking effect of this act, and at such times thereafter as may be necessary, or as he may be ordered to do so by the district judges, number ten (10) small cards in numerical order from one to ten, both inclusive; shall place not more than one number on each card, and shall use each number but once, in the manner hereafter provided." It will be observed from the foregoing that the cards can be made and numbered without an order of the court and in the absence of any showing to the contrary it will be presumed that this procedure was followed. There was no written order of the court directing the key number to be drawn which was drawn on June 3, 1941, at 11:00 a. m. Section 20-1627, Comp. St. 1929, provides in part as follows: "He shall then place said cards in a small box or wheel provided for that purpose, close the box or wheel and thoroughly shake the

same, and then draw therefrom by chance, one of the cards in the presence of the judge or judges. The number thus drawn shall be known as the key number. The jury commissioner shall immediately after drawing the key number deliver it to the officer having charge of the election records, who shall thereafter be the custodian thereof, and shall make a record of his acts at once, in connection therewith, that is, the placing of the cards in the box or wheel, the drawing of the key number therefrom, the presence of the judges, naming them, the date and hour of such drawing, the same to be certified by the officer having charge of the election records and such records shall become a part of the public records of the county." The record shows this provision was complied with and no written order is necessary.

Complaint is made because no jury list was made from the poll books and registrations after the 1942 elections. Section 20-1629, Comp. St. Supp. 1941, provides in part: "The list as thus revised shall constitute the list from which petit jurors shall be selected, until such list shall have been exhausted in the manner hereinafter set forth." There is no showing that the jury list created by the drawing of a key number on June 3, 1941, at 11:00 a. m., was exhausted and until that happens or the list is quashed, no new jury list could be made by the drawing of a new number which would affect the poll books and registration of the 1942 election.

We have carefully examined all of the acts done by the officers in pursuance of their duties under these statutes as disclosed by the record and find them to be in proper order and, as we have previously stated, in the absence of showing to the contrary, we will presume that the officers charged with the duty of selecting and impaneling the jury have faithfully performed their duty according to law.

The defendant further complains that he was not properly arraigned as by statute provided under the rule as announced in *Barker v. State,* 54 Neb. 53, 74 N. W. 427; *Browning v. State,* 54 Neb. 203, 74 N. W. 631; and *Bur-*

*roughs v. State,* 94 Neb. 519, 143 N. W. 450, to the effect that, "Under section 448 of the criminal code, a conviction of a felony will not be sustained where the defendant enters his objection after the verdict, unless the record affirmatively discloses that the accused was arraigned, and that he pleaded to the information or indictment before the trial." The code then provided by section 448 as follows: "The accused shall be arraigned by reading to him the indictment, unless, in cases of indictments for misdemeanors, the reading shall be waived by the accused by the nature of the charge being made known to him, and he shall then be asked whether he is guilty or not guilty of the offense charged." However, since these decisions this act has been amended by the 1925 session of the legislature, now being section 29-1815, Comp. St. 1929, and reads as follows: "The accused shall be arraigned by reading to him the indictment, unless, the reading shall be waived by the accused, by the nature of the charge being made known to him, and he shall then be asked whether he is guilty or not guilty of the offense charged. If the accused appear in person and by counsel and goes to trial before a jury regularly impaneled and sworn he shall be deemed to have waived arraignment, and plea of not guilty deemed to have been pleaded." The most that can be said of the defendant's contention is that the proceedings had were void. Assuming, but not deciding, this to be true, the effect would be that the defendant was not arraigned. In view of this amendment we hold that, when the accused appears in person and by counsel and goes to trial before a jury regularly impaneled and sworn, he shall be deemed to have waived arraignment and a plea of not guilty to have been pleaded. *Hill v. State,* 116 Neb. 73, 215 N. W. 789.

There is a further reason why this contention is without merit. Journal 416 on page 117 of the court's journal shows the following to have happened in open court as of March 9, 1943: "Thereupon defendant William Maher is duly arraigned and stands mute and refuses to plead and the court enters a plea of not guilty as to Count 1 and a plea

of not guilty as to Count 2 of the information." "The transcript imports absolute verity, and cannot be impeached. If incorrect, or if it fails to speak the truth, the correction must be made in the district court and not here." *Ford v. State,* 46 Neb. 390, 64 N. W. 1082. And as stated in *Brown v. Ritner,* 41 Neb. 52, 59 N. W. 360: "The approved journal entry of a judgment is indisputable evidence of what the judgment was."

The defendant complains because of the court's refusal to grant him a continuance. As stated in *Cornell v. State,* 138 Neb. 708, 294 N. W. 851: " 'An application for a continuance is addressed to the sound discretion of the trial court and its ruling thereon will not be held erroneous, unless an abuse of discretion is disclosed by the record.' *Kerr v. State,* 63 Neb. 115, 88 N. W. 240." And in *Flannigan v. State,* 127 Neb. 640, 256 N. W. 321: "It is no abuse of discretion for the trial court to refuse defendant a continuance unless it clearly appears that defendant suffered prejudice."

Defendant's counsel complained of the state of his health and urged a continuance because thereof. The record discloses that the court did not abuse its discretion in denying a continuance in this respect. While the court was at all times solicitous of counsel's welfare, it appears from the record that counsel was at all times vigorously active in behalf of his client and that during the entire trial fully protected his interests.

The defendant further complains of the fact that certain witnesses which he desired to be present were in the armed forces of their country and therefore not available. He offered evidence establishing this fact. An analysis discloses that these witnesses are friends and associates of the defendant. He spent the evening of February 24, 1942, with several of them prior to his going to the Red Rooster Cafe at 3011 St. Mary's avenue at about 12:30 a. m. of February 25. No question is raised as to his whereabouts prior to his going to the cafe nor is it material for by his own testimony he admitted staying there until the time of his being taken into custody.

With reference to Lawrence and Mike Scavio, who are brothers of Mrs. Raymond C. Agosta, the defendant testified he talked to them a couple of days before February 25, 1942, and made arrangements with Lawrence to buy him a couple of five-gallon cans. That he was to take them to the Red Rooster Cafe in order that Lawrence might have them filled with gasoline so he could pick them up when driving a car from Chicago to the west coast. This being in explanation of the reason why he bought the cans and took them to the Red Rooster Cafe. Their evidence would only corroborate his own testimony on this subject.

Raymond C. Agosta, who operated the Red Rooster Cafe and to whom the defendant testifies he delivered the cans on the evening of February 24, 1942, at about 8:30 p. m. at the cafe, died on the morning of the first day of the trial. Defendant further testified Agosta, at the time he delivered the cans, asked him to come out and help Tony Scavio take care of the place and that is the reason he went to the cafe later in the evening. This testimony is likewise only corroborative, but it is also testimony that cannot be produced at any subsequent date.

The testimony of these witnesses is not to material matters in the case and only corroborative. It can hardly be conceived that every witness a defendant may desire will be available at any one time. We have given this matter careful consideration and while the court should endeavor to fix a time for trial when the witnesses of both the defendant and state can be present, we do not find that any of the testimony was as to such a material matter that the defendant was thereby prevented from having a fair trial and we find that the trial court in no way abused its discretion in denying a continuance.

The defendant complains that he was not given a speedy trial as by our state and federal Constitutions guaranteed to every person charged with the commission of a crime. In support of this contention he cites the fact that many witnesses that would have been available if a speedy trial had been granted are now in the armed services or dead

and therefore not available. These witnesses and the nature of their testimony has been discussed under the matter of the denial of a continuance. The record discloses that after the information was filed. in district court on March 17, 1942, the defendant never applied to the court to have his case set down for trial and only after it had been set for trial on February 8, 1943, did he appear to object to a continuance, which was granted to the state until March 8, 1943. The defendant did testify that on several occasions he went to the office of the county attorney and talked to someone about the trial of his case, but he does not know with whom he talked. Our state Constitution provides in section 11, art. I, in part as follows: "In all criminal prosecutions the accused shall have the right to * * * a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." This provision of our Constitution is self-executing and in accordance with Amendment VI of the Constitution of the United States, which provides in part as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, * * * ." The defendant was admitted to bail and in such cases our legislature has provided by section 29-1203, Comp. St. 1929, as follows: "If any person indicted for any offense, who has given bail for his appearance, shall not be brought to trial before the end of the third term of the court in which the cause is pending, held after such indictment is found, he shall be entitled to be discharged, so far as relates to such offense, unless the delay happen on his application, or be occasioned by the want of time to try such cause at such third term." "The statute supplements the constitutional provision and secures or provides a method for securing the right thereby declared. It is to be regarded as enacted for the purpose of rendering the constitutional guaranty effective, and as a legislative declaration of what is and what is not, under the circumstances named, a reasonable and proper delay in bringing an accused to trial in respect of his constitutional right aforesaid." *State v. Keefe,* 17 Wyo. 227, 243, 98 Pac. 122.

See, also, 22 C. J. S. 713, 716, sec. 467; *In re Schechtel*, 103 Colo. 77, 82 Pac. 2d 762.

"No general principle fixes the exact time within which a trial must be had to satisfy the requirement of a speedy trial. The right to a speedy trial is necessarily relative; * * * ." 22 C. J. S. 713, 715, sec. 467. As stated in *Critser v. State*, 87 Neb. 727, 127 N. W. 1073: "There is room for the exercise of sound discretion on the part of the trial court, always bearing in mind that the right to a speedy trial is the constitutional right of any citizen who is accused of crime." The legislature of our state has interpreted the Constitution on the matter of a speedy trial by fixing what, in certain cases and under certain conditions, is to be regarded as a maximum time within which a defendant must be tried. The interpretation of this constitutional provision is for the court, but since the time fixed by the legislature is not unreasonable, we adopt it as our own. The defendant, having failed to bring himself within the provisions thereof, is not entitled to be discharged under its terms. But the legislature has not undertaken to fix any minimum time in such matters. What is a fair and reasonable time in each particular case is always in the discretion of the court. No hard and fast rule can be applied in all cases. Under the facts in this case we find that the defendant had a speedy trial within the constitutional provision.

The record shows that the defendant was arrested on February 25, 1942; that complaint was filed in the municipal court on February 27, 1942; that preliminary hearing was commenced on March 5, 1942, and continued until March 13, 1942, when defendant was bound over to the district court where information was filed on March 17, 1942. The statute with reference to the time within which a preliminary hearing must be had in cases of extra jurisdictional offenses is set forth in section 29-504, Comp. St. 1929, which in part provides as follows: "That when the complaint if (is) for a felony, * * * upon the accused being brought before the magistrate he shall proceed as soon as may be, in presence of the accused, to inquire into the com-

plaint." As stated in *Critser v. State, supra*: "There is room for the exercise of sound discretion on the part of the trial court, always bearing in mind that the right to a speedy trial is the constitutional right of any citizen who is accused of crime." The question as to the time in which the defendant should be given a preliminary hearing is a question for the court. There can be no precise length of time, after the arrest of a person, in which he must be given a hearing. The theory of the law is that he must be given a hearing as soon as possible. A person charged should be given a preliminary hearing just as soon as the nature and circumstances of the case will permit. Under the facts here we find that the preliminary hearing held was such as to give the defendant a speedy trial under the Constitution.

The defendant further complains that the court erred in refusing to give certain instructions which had the effect of submitting to the jury the question of whether or not the defendant had a speedy trial as by the Constitution provided. In this we think the trial court was right. The question of whether or not a defendant has had a speedy trial under the provisions of our state and federal Constitutions is always a matter of judicial determination by the court and not one of fact for the jury. 22 C. J. S. 713, 715, sec. 467; *Critser v. State, supra*; *State v. Simpson*, 125 Wash. 665, 216 Pac. 874; *Reed v. State*, 94 Fla. 32, 113 So. 630; *People v. Romero*, 13 Cal. App. 2d 667, 57 Pac. 2d 557; *Shafer v. State*, 43 Ohio App. 493, 183 N. E. 774.

With reference to the defendant's contention that the trial judge, not being a judge of the Fourth Judicial District in which Douglas county is located, was without jurisdiction since no written request or order had ever been given by any judge of the Fourth Judicial District or by order of the supreme court, we find it to be without merit. The record discloses that one of the judges of the Fourth Judicial District had asked the trial judge, who is a district judge of this state, to try this case. Our statute, section 27-303, Comp. St. Supp. 1941, does not require that such request be in writing.

The defendant contends that the evidence is insufficient to establish the *corpus delicti* of the crime charged and that under the rule as to circumstantial evidence it is insufficient to sustain defendant's conviction.

Evidence offered by the state shows that Raymond C. Agosta owned the fixtures and operated a restaurant and beer business at 3011 St. Mary's avenue, Omaha, Douglas county, Nebraska, known as the Red Rooster Cafe. His wife, Rosie, was a sister of Tony, Lawrence, and Mike Scavio who will be referred to herein. Agosta had been trying to sell the business but had been unsuccessful in doing so. He had removed or changed some of the equipment in the restaurant. On January 15, 1942, he purchased fire insurance on the contents in the sum of $1,300. There was very little stock in the place on February 24, 1942.

On the afternoon of February 24, 1942, the defendant, William Maher, rented a car from the Capitol Drive It Yourself Co. in Omaha, and went to the Continental Can Co. where he purchased two square five-gallon cans similar to the ones found at the cafe. Later that evening, or rather in the early morning of February 25 at about 2:30 a. m., Lickert and Elias, officers of the Omaha police force, stopped their cruiser car on St. Mary's avenue just east of the cafe to assist a resident of the city who was asleep in his car. At that time the cafe was closed. They awakened him and finding his condition such that he was not able to drive took him to his home. It might be mentioned that a heavy snow had fallen and generally the sides of the streets were blocked with snow and only the lanes for traffic were open. The car in which the resident was asleep was in the traffic lane on St. Mary's avenue just east of the cafe.

After taking this party home the officers, some time between 3:30 and 4:00 a. m., while driving down St. Mary's avenue, noticed that all of the lights in the cafe were out and the door was slightly open. They stopped their car and officer Lickert immediately went to the front door and officer Elias flashed the spot light on the cafe and started to go to the back door but changed his mind and likewise came

to the front door. When the car stopped someone closed the door of the cafe, dropped down and went to the back of the room. When officer Lickert came to the door the defendant was crouched in the back of the front room. Upon being asked what he was doing, he told officer Lickert that everything was all right. However, officer Lickert, who had previously drawn his gun, insisted on the door being opened. Upon entering they turned on a beer sign.

It might be well to mention here that the cafe fronts north on St. Mary's avenue and is not exactly rectangular because of the diagonal direction of the avenue. The inside of the building is partitioned into two rooms, the front room being larger than the back with two doors in the partition. The one door is on the east and just back of the bar and restaurant counter located in the east part of the front room. The other is in the west part of the partition just back of the booths located in the west part of the front room. The transom above the street door was open.

When officers Lickert and Elias entered the room, Tony Scavio, who was also in the building, had on his overcoat and hat and the defendant had on his hat and his overcoat and was near the door lying over a cigarette machine. Just to the left of the door and between the counter and juke box, which was just to the left as you entered, was a five-gallon can, similar to the ones the defendant had purchased the previous afternoon, with the lid off and containing a small amount of gasoline. Gasoline was generally distributed over the bar and lunch counter, the floor, on top of and under the seats of the booths, and on the equipment back of the counter. Such things about the place as napkins, napkin holders, newspapers, rags and other miscellaneous items were soaked with gasoline. Standing in the open doorway of the west partition door was another can, similar to the ones the defendant had purchased the previous afternoon, full of gasoline and with the lid removed. Neither lid of these two cans was found at the cafe. While the officers were there the defendant said he thought the gas was on and went back of the counter and apparently closed the jets

on the gas stove. When the officers entered the room it was filled with gasoline fumes. Being asked how the gasoline got there, Scavio said he did not know and the defendant kept still.

Without being searched, the defendant and Scavio were both taken to police headquarters in the car of officers Lickert and Elias. The defendant rode in the front seat on the right-hand side and Scavio in the back seat on the right-hand side and they both got out on that side at the police station. Some five or ten minutes thereafter one of the officers discovered, near the right front fender of this car, two caps, similar to those used on cans such as they found at the cafe, also, a pair of gloves soaked with gasoline. Upon being searched they found the key of the cafe in the defendant's shoe. The car the defendant had rented was found parked on 30th street just south of St. Mary's avenue. On the floor mat in front of the back seat were found heavy square indentation marks, the same as would be made by the cans found in the cafe, and some oily substance was on the mat around the marks.

Evidence was offered by the defendant to show that the removal and exchange of fixtures were done prior to the purchase of the insurance. Defendant admits that he purchased the two cans but states that he purchased the same for Lawrence Scavio who had asked him to do so several days prior to February 24, 1942. That Lawrence wanted him to leave them at the cafe in order that he might have them filled with gasoline as he was going to drive a car from Chicago to the west coast and wanted to pick up some extra gasoline. Defendant testified he took the empty cans out to the cafe around 8:30 p. m. of the evening of the 24th and gave them to Raymond C. Agosta. While there Agosta told him that Tony Scavio was going to take care of the cafe that evening and he would like to have him come out and help him. He told Agosta that he was busy the early part of the evening but if he could he would come out later. That he returned later that evening sometime between 12:30 and 1:00 a. m. of the 25th. Upon arriving at the cafe

he was immediately called to the back room by Tony Scavio and remained there during the entire time he was at the cafe. When he entered the cafe he did not observe either of the cans which were later found there. That Tony Scavio waited on business whenever anybody came in but always returned to the back room where they played pitch while he drank beer and Scavio drank whisky. Customers came in and out until late in the night when two men came in who seemed to be considerably under the influence of liquor. Scavio waited on them and then they left, but shortly thereafter, between 2:00 and 2:30 a. m., one returned and he and Scavio got into an argument. He heard some confusion in the front room but did not go out. Scavio finally put the man out and came back to the room and told him that he had spilled something and got a rag to wipe it up. When he came back he told the defendant that some officers had just picked up the drunk. They then remained in the back room for some time but at no time, while he was in the back room, did he smell any gasoline fumes. As they went to leave he walked through the west partition door into the front room where he noticed gasoline fumes for the first time. Scavio then told him that in the scuffle the customer had knocked over a can of gasoline and some had spilled out onto the counter and floor. Scavio had just turned out the back light and there was still a light burning in the front and that they had just opened the door and were about to leave when the officers drove up. He also testified they had just opened the transom and door to clean up the place.

This is necessarily an abbreviated statement of the facts contained in a lengthy bill of exceptions but fairly presents the events that transpired during the course of February 24 and the early morning of February 25, 1942, as disclosed by the evidence.

The evidence offered by the defendant conflicts with the state's testimony and the testimony of the defendant himself on many material matters is contradictory, but, of course, the weight of conflicting and contradictory evidence

was a matter for the jury and as they found the defendant guilty, they have found such conflict in favor of the state.

As stated in 6 C. J. S. 759, sec. 38: "It is recognized by the courts that, because of their very nature, arson or related crimes of illegal burning can seldom be established by direct and positive testimony of witnesses who actually saw the fire set, and, accordingly, a conviction may be had on circumstantial evidence, but the circumstances relied upon must be clearly and unequivocally proved, and be consistent with each other and with the hypothesis that accused is guilty, and inconsistent with the hypothesis that he is innocent and with every other rational hypothesis except that of guilt."

"To sustain a conviction for a crime the *corpus delicti* must be proven beyond a reasonable doubt." *Chezem v. State,* 56 Neb. 496, 76 N. W. 1056. See, also, *McCue v. State,* 112 Neb. 9, 198 N. W. 163; *Andersen v. State,* 141 Neb. 306, 3 N. W. 2d 447. The *corpus delicti* may be proved by circumstantial evidence. *Andersen v. State, supra.* This is true in arson cases. *Salistean v. State,* 115 Neb. 838, 215 N. W. 107; *Robino v. State,* 133 Neb. 391, 275 N. W. 463; *State v. Goldman,* 166 Minn. 292, 207 N. W. 627. Circumstantial evidence alone may sufficiently establish the *corpus delicti* and the guilt of the accused. As stated in *Morgan v. State,* 51 Neb. 672, 71 N. W. 788: "The test by which to determine the sufficiency of circumstantial evidence in a criminal prosecution, is whether the facts and circumstances tending to connect the accused with the crime charged are of such conclusive nature as to exclude to a moral certainty every rational hypothesis except that of his guilt." See, also, *Dreessen v. State,* 38 Neb. 375, 56 N. W. 1024; *Robino v. State, supra.* An instruction was given submitting the question of the sufficiency of the evidence under the circumstantial evidence rule and the jury found the defendant guilty of the crime as charged in count one of the information and from an examination of the evidence as a whole we cannot say that the jury were wrong. The evidence is sufficient to sustain the conviction.

The defendant assigns as error the instructions given by the court and the refusal to give certain instructions which he tendered. With reference to the general assignment as to the instructions given by the court, the following rule announced in *Hiatt v. Kinkaid*, 40 Neb. 178, 58 N. W. 700, is applicable: "An assignment of error as to the giving *en masse* of certain instructions will be considered no further than to ascertain that any one of such instructions was properly given." However, in view of the defendant's separate assignment of error as to 16 of the 23 instructions, which he tendered, but all of which the court refused, it will be necessary to examine and consider all of the instructions given by the court for as stated in *Bourne v. State*, 116 Neb. 141, 216 N. W. 173: "It is the duty of the court, with or without request, to instruct the jury as to the law of the case." And as stated in *Goldman v. State*, 128 Neb. 684, 260 N. W. 373: "It is error to refuse an offered instruction which is warranted by the evidence and correctly states the law of the case, unless the principles of law involved are covered by other instructions given." We have examined the instructions given and they completely and correctly submitted the questions at issue to the jury. As to the instructions tendered by the defendant and refused, they are either covered by the instructions given, not proper in form, or not warranted under the evidence. We find no error in the instructions given nor in the refusal to give those submitted by the defendant.

The defendant complains that the sentence of two years is excessive. With this we cannot agree. The statute under which defendant was convicted provides for a penalty of a fine up to $1,000 or a sentence of not less than one nor more than two years in the penitentiary. Comp. St. Supp. 1941, sec. 28-5,101. After the defendant was convicted, the trial judge sought information as to his character and reputation in the community where he lived for the purpose of assisting him to determine the proper sentence to impose. This is criticized by the defendant and assigned as reversible error. The sentence to be imposed is largely a

matter in the discretion of the trial court and for the purpose of exercising this discretion he is entitled to inform himself as to the character and reputation of the defendant in the community in which he lives. From what is contained in the record, it is clearly evident why the trial court imposed the maximum sentence. Very serious consequences would undoubtedly have developed had the plans of the defendant been fully completed. We do not find the sentence to be excessive.

The defendant contends the court erred by imposing sentence upon defendant without making a written entry of the order overruling his motion for new trial. The record discloses that the trial judge, prior to sentencing the defendant, overruled his motion for new trial. This is set out in the journal signed by him. As stated in *Brown v. Rittner*, 41 Neb. 52, 59 N. W. 360: "The approved journal entry of a judgment is indisputable evidence of what the judgment was." "A judgment of a court is valid and effective when it is declared and announced by the judge, although it may not be reduced to writing until afterwards." *State v. Warrick*, 106 Neb. 750, 184 N. W. 896. See, also, *Luikart v. Bredthauer*, 132 Neb. 62, 271 N. W. 165. This contention of the defendant is without merit.

The defendant refers to the duty of the trial judge, as announced in *Bourne v. State, supra*, that it is the duty of the court to endeavor to surround the trial with an atmosphere of fairness, undisturbed by prejudice, passion, or ill-will, and with this we fully agree. An examination of the record discloses that the trial judge did endeavor to do just that and we think very successfully. It appears from the entire record that the defendant had a fair trial and that no errors occurred that entitle him to have his conviction vacated or set aside and it is therefore affirmed.

AFFIRMED.