## GALLEGOS *v.* NEBRASKA.

No. 94.   Argued October 8, 1951.—Decided November 26, 1951.

*Robert G. Simmons, Jr.* argued the cause for petitioner. With him on the brief were *James G. Mothersead* and *Floyd E. Wright.*

*Walter E. Nolte,* Deputy Attorney General of Nebraska, and *Homer L. Kyle,* Assistant Attorney General, argued the cause for respondent. With them on the brief was *Clarence S. Beck,* Attorney General.

Mr. Justice Reed announced the judgment of the Court and an opinion in which The Chief Justice, Mr. Justice Burton and Mr. Justice Clark join.

Petitioner, Agapita Gallegos, was convicted in a District Court of Nebraska of manslaughter and sentenced to ten years' imprisonment, the maximum penalty. The charge was the slaying of his paramour without deliberation or premeditation. This judgment of conviction was sustained by the Supreme Court of Nebraska over the objection that introduction at the trial of petitioner's prior statements admitting the homicide violated the Fourteenth Amendment of the Constitution. In view of certain undenied incidents giving color to petitioner's allegation of unfairness in the prosecution, certiorari was granted to determine whether the due process requirements of the Fourteenth Amendment were violated by the admission of the statements. 341 U. S. 947.

On September 19, 1949, at the request of the United States Immigration and Naturalization Service, petitioner, a thirty-eight-year-old Mexican farm hand who can neither speak nor write English, was arrested, together with his brother, by police officers of El Paso County, at the southwest corner of Texas, and there booked on a charge of vagrancy. Gallegos had been an itinerant farm worker in this country before his arrest and had recently returned here for such work.

We gather from the abbreviated record that information was sought by the Texas authorities as to petitioner's acts in Nebraska, where he had worked the preceding year. After arrest, petitioner was questioned regarding his identity. He at once gave a false name. Thereafter,

he was jailed in a small room for the next twenty-one hours. Further questioning to establish identity was had on September 20, 1949, without result. Follov ng his second interrogation, petitioner was left alone for forty-eight hours. On September 22, 1949, petitioner was removed from his cell and interrogated. After he gave his name and an admission that he had been in Nebraska, he was reconfined; this time confinement ran for a period of twenty-four hours.

On September 23, 1949, petitioner disclosed details of this Nebraska crime. A statement in respect of the crime was immediately prepared in English. This was read to the petitioner in Spanish, and he thereafter signed it. His Texas detention continued until September 27, 1949. During the entire time no charge was filed against him in any state or federal court nor was he brought before a magistrate.

We have Gallegos' evidence as to his Texas confinement, the rooms he was placed in, their condition as to furnishings, and the food provided. His testimony on these points is met only in part by the testimony of the Chief Deputy Sheriff of El Paso, his interrogator. There were times when Gallegos was not under his direct observation. Nebraska had no other witness for the trial familiar with conditions of the Texas restraint. Gallegos' testimony through the interpreter concerning these matters is vague. From it one gathers that Gallegos sought to convey the impression that the rooms were cells, that the one he occupied for twenty-one hours was without a bed, that one he occupied was without light or poorly lighted, and that the food was sparse, perhaps not more than a meal a day.

During the questioning in the four-day period from September 19th through the 23d, the state says petitioner was not treated or threatened with violence. His questioning did not last longer than an hour or two on any

day and according to the record was conducted almost entirely by the state's witness, the Chief Deputy Sheriff. However, Gallegos testifies that he was told that he might be turned over to the Mexican authorities for more severe questioning and that a lie detector might be used upon him. The record shows no flat denial of Gallegos' assertions contained in the last sentence, but it does show, by testimony of the Deputy Sheriff, that no threats or promises were made and that reference to the Mexican authorities, if made, was that Gallegos would be turned over to the United States Immigration Service who, in turn, would deliver him to the Mexican Immigration Service. Gallegos also spoke of threatened violence.[1]

On September 27, 1949, a Nebraska sheriff reached Texas and took petitioner to the Scotts Bluff County, Nebraska, jail, arriving Thursday, September 29, at 1 a. m. Gallegos was questioned on Saturday, October 1, at which time he was interviewed through an interpreter by three county police officers. He described the crime

---

[1] "Q. At any time when anybody was talking to you at the jail in El Paso, Texas, did they act like they were trying to scare you?

"A. Yes, sir.
"Q. Tell us when that was?
"A. When they started to investigate me.
"Q. Was that the first day you were in jail or the second day or the third day?
"A. The first day.
"Q. Tell us what happened.
"A. They tried to get words out of my forcibly by another sheriff that is there.
"Q. Do you know who that other sheriff was?
"A. I don't know what his name is.
"Q. Have you seen him here in this court room?
"A. No, sir.
"Q. What did he do?
"A. He would not take his eyes away from me and he seemed

for which he was convicted. A transcript in English of the interpreter's translations of the interview was made and some days later read back to petitioner in a Spanish retranslation. The evidence is that Gallegos confirmed this record. The record shows no claim of mistreatment by Nebraska authorities.

By § 29–406, Neb. Rev. Stat., 1943, a police officer is commanded to take an accused before a magistrate. This was not done until October 13, 1949, when petitioner was brought before the county judge of Scotts Bluff County for a preliminary hearing on a complaint charging murder in the second degree. This was the first time petitioner was brought before any magistrate or court. As an incident to the hearing, petitioner was asked to plead. He pleaded guilty. These two confessions and the plea were introduced at petitioner's trial by the state. On October 15, 1949, before trial, the District Court of Scotts Bluff County found petitioner to be entitled to

---

like he wanted to hit me and I was frightened and I didn't know what to do." [R. 84–85.]

"Q. But you say no one struck you?

"A. No.

"Q. And no one ever raised their arm as if they were going to strike you?

"A. The other fellow.

"Q. What other fellow?

"A. The other one that investigated me.

"Q. Where did he do that?

"A. In one room that he had there where he was investigating me.

"Q. How did he threaten to strike you?

"A. With his hand.

"Q. Did he strike you at that time?

"A. He just raised his hand.

"Q. Did he say he was going to strike you?

"A. He said he was going to hit me because I would not tell him the truth.

"Q. But he still did not hit you?

"A. No, he did not hit me." [R. 90–91.]

counsel appointed by the court, and counsel was then for the first time appointed.

Petitioner presents in his brief only the following question:

> "Are confessions and a plea obtained from a prisoner during a period of twenty-five days illegal detention by federal and state officers before being brought before a magistrate and before counsel is appointed to assist the prisoner admissible in evidence?"

An answer requires an examination into the circumstances of record surrounding the statements.

Before the Supreme Court of Nebraska, on the basis of facts in the record of the trial, it was urged that the confessions and plea were inadmissible because they were the result of "physical torture and threats of torture, mental duress, illegal transportation and illegal detention," in violation of the federal and state constitutions. As conviction without acceptance of the voluntary character of the confessions would logically have been impossible, we assume that the jury, under applicable instructions, found the statements voluntary. 152 Neb. 831, 837–840, 43 N. W. 2d 1, 4–6. Evidently, neither judge nor jury accepted the testimony of Gallegos on disputed facts as to coercion. Where direct contradiction of petitioner's assertions as to conditions of his detention in Texas was unavailable or unobtainable, the jury disregarded or minimized or disbelieved Gallegos to such an extent that his confessions were accepted as voluntary. The Deputy Sheriff, the prosecution witness in the best position to know, denied any coercion by promise, threat or violence. A criminal prosecution approved by the state should not be set aside as violative of due process without clear proof that such drastic action is required to protect federal constitutional rights. While our conclusion on due process

does not necessarily follow the ultimate determinations of judges or juries as to the voluntary character of a defendant's statements prior to trial, the better opportunity afforded those state agencies to appraise the weight of the evidence, because the witnesses gave it personally before them, leads us to accept their judgment insofar as facts upon which conclusions must be reached are in dispute. The state's ultimate conclusion on guilt is examined from the due process standpoint in the light of facts undisputed by the state.[2] That means not only admitted facts but also those that can be classified from the record as without substantial challenge.

As this Court has been entrusted with power to interpret and apply our Constitution to the protection of the right of an accused to federal due process in state criminal trials, the proper performance of that duty requires us to examine, in cases before us, such undisputed facts as form the basis of a state court's denial of that right. *Kansas City Southern R. Co.* v. *Albers Comm'n Co.,* 223 U. S. 573, 591; *Norris* v. *Alabama,* 294 U. S. 587, 594; *Watts* v. *Indiana,* 338 U. S. 49, 51. A contrary rule would deny to the Federal Government ultimate authority to redress a violation of constitutional rights. As state courts also are charged with applying constitutional standards of due process, in recognition of their superior opportunity to appraise conflicting testimony, we give deference to their conclusions on disputed and essential issues of what actually happened. See note 2, *infra.* Its duty compels this Court, however, to decide for itself, on the facts that are undisputed, the constitutional validity of a judgment that denies claimed constitutional rights.

---

[2] *Lyons* v. *Oklahoma,* 322 U. S. 596, 603; *Malinski* v. *New York,* 324 U. S. 401, 404; *Haley* v. *Ohio,* 332 U. S. 596, 599; *Watts* v. *Indiana,* 338 U. S. 49, 51. Cf. *Lisenba* v. *California,* 314 U. S. 219, 238–241.

Controversies as to facts take various forms. The jury may reach a verdict of guilty although they resolved some subsidiary fact in favor of the accused. In Gallegos' case we do not know whether his assertions not directly contradicted as to questionable conditions of his Texas detention and examination were accepted as true by the jury. It is quite possible that the jury thought the confession voluntary even though it believed all of Gallegos' testimony. As we cannot accept the verdict as a finding solely on disputed facts, we must weigh Gallegos' uncontradicted testimony along with the undisputed facts. We are not free, as Nebraska was, to leave to the jury determinations of facts upon which the admissibility of the statements is based.[3]

The issue of federal due process now tendered is to be considered only on uncontroverted facts. The answer to the question presented depends upon whether there is a violation of the Due Process Clause of the Fourteenth Amendment from the admitted circumstances that

---

[3] 152 Neb. 839, 43 N. W. 2d 5:

"While there is testimony given by the defendant from which the jury could have found that the confessions made were involuntary due to the manner in which defendant was held in confinement, the treatment received while so held, and the threats made; however, the testimony of the authorities in charge, both at El Paso and Scottsbluff, deny these facts and when their testimony is taken together with certain testimony of the defendant, it presents a factual situation from which the jury could properly find that the confessions were freely and voluntarily made. This includes the issue presented by the evidence offered as to whether or not the complaint was properly translated at the preliminary hearing so it was understood by the defendant in making his plea thereto. It also includes the question of whether or not he understood the nature or degree of the crime with which he was charged. These issues both relate themselves directly to the question of whether or not he understood what he was doing when he made his admission of guilt and consequently relate directly to whether it was voluntarily or involuntarily made."

the two confessions of September 23 and October 1 were given to police officers after arrest in Texas on September 19, 1949, while no magistrate with supervisory power over the examinations was present and while the accused was without counsel. Circumstances surrounding the Texas, as well as the Nebraska, confession must be appraised because Nebraska introduced the Texas confession in evidence in the trial. The use of any confession obtained in violation of due process requires the reversal of a conviction even though unchallenged evidence, adequate to convict, remains. *Malinski* v. *New York*, 324 U. S. 401, 404. Both states require fugitives from justice to be promptly taken before a magistrate on arrest for extradition. Texas, Vernon's Code of Criminal Procedure, Arts. 998, 999, 217. Neb. Rev. Stat., 1943, §§ 29–713, 29–715. The question must be weighed in the light of the uncontradicted portion of Gallegos' own testimony of harsh treatment and the answers of the prosecution and the judge and the jury. The plea of guilty at the preliminary hearing on October 13 is also a factor. We therefore limit our examination to an inquiry as to whether use at trial of these admissions of guilt theretofore made by an accused violates the Fourteenth Amendment.

The decision and judgment below determine for us that under the law of Nebraska such detention and examination, without appearance or arraignment, do not require exclusion of the confessions or plea as involuntary.[4] The rule of the *McNabb* case, considered recently in *United States* v. *Carignan*, 342 U. S. 36, is not a limitation im-

---

[4] *Gallegos* v. *State*, 152 Neb. 831, 839-840, 43 N. W. 2d 1, 6:

"In regard to how soon after a person is arrested he must be given a preliminary hearing we said in Maher v. State, 144 Neb. 463, 13 N. W. 2d 641: 'The question as to the time in which the defendant should be given a preliminary hearing is a question for the court. There can be no precise length of time, after the arrest of a person, in which he must be given a hearing. The theory of the law is that

posed by the Due Process Clause. *McNabb* v. *United States*, 318 U. S. 332, 340; *Lyons* v. *Oklahoma*, 322 U. S. 596, 597, note 2. Compliance with the *McNabb* rule is required in federal courts by this Court through its power of supervision over the procedure and practices of federal courts in the trial of criminal cases. That power over state criminal trials is not vested in this Court. A confession can be declared inadmissible in a state criminal trial by this Court only when the circumstances under which it is received violate those "fundamental principles of liberty and justice" protected by the Fourteenth Amendment against infraction by any state.[5]

The Federal Constitution does not command a state to furnish defendants counsel as a matter of course, as is required by the Sixth Amendment in federal prosecutions.[6] Lack of counsel at state noncapital trials denies federal constitutional protection only when the absence results in a denial to accused of the essentials of justice.[7]

---

he must be given a hearing as soon as possible. A person charged should be given a preliminary hearing just as soon as the nature and circumstances of the case will permit.'

". . . Here the court, in the first instance, heard all of the evidence relating thereto and determined that sufficient foundation had been laid for their admission. The evidence was then presented to the jury and the question as to their character, whether voluntary or involuntary, was submitted to it by the court's instructions Nos. 12, 13, and 14. We find the facts and circumstances relating to the giving of the two confessions and the admission of guilt at the preliminary hearing justified the trial court in admitting them in evidence in the first instance and submitting their character, whether voluntary or involuntary, to the jury. See Kitts v. State [151 Neb. 679, 39 N. W. 2d 283]."

[5] *Hebert* v. *Louisiana*, 272 U. S. 312, 316; *Adamson* v. *California*, 332 U. S. 46, 54.

[6] *Quicksall* v. *Michigan*, 339 U. S. 660; *Bute* v. *Illinois*, 333 U. S. 640; *Foster* v. *Illinois*, 332 U. S. 134.

[7] *Uveges* v. *Pennsylvania*, 335 U. S. 437, 441; *Betts* v. *Brady*, 316 U. S. 455, 462; compare *Hawk* v. *Olson*, 326 U. S. 271, 278.

Lack of counsel prior to trial certainly has no greater effect. *Lyons* v. *Oklahoma, supra,* p. 599. "The mere fact that a confession was made while in the custody of the police does not render it inadmissible." *McNabb* v. *United States,* 318 U. S. 332, 346; cf. *United States* v. *Carignan,* 342 U. S. 36, 39.

Prolonged detention without a charge of crime or without preliminary appearance before a magistrate, the lack of counsel before, during, or after arraignment, and confession to the police in private, are, however, elements that should be considered in determining whether a confession, permitted to be introduced and relied upon at a trial, has been obtained under such circumstances that its use violates due process. *Watts* v. *Indiana,* 338 U. S. 49, 54. Of course, the plea of guilty at the preliminary hearing should be treated in the same way as the confessions.

So far as due process affects admissions before trial of the defendant, the accepted test is their voluntariness.[8] This requires appraisal of the facts of each particular case open to consideration by this Court. In recent cases, where undisputed facts existed far more likely to produce involuntary confessions than those in this case, there was disagreement as to whether due process was violated.[9]

---

[8] *Brown* v. *Mississippi,* 297 U. S. 278, 285–286; *Chambers* v. *Florida,* 309 U. S. 227, 236, 238; *Lisenba* v. *California,* 314 U. S. 219, 238.

[9] *Watts* v. *Indiana,* 338 U. S. 49, 51, 52:

"On November 12, 1947, a Wednesday, petitioner was arrested and held as the suspected perpetrator of an alleged criminal assault earlier in the day. Later the same day, in the vicinity of this occurrence, a woman was found dead under conditions suggesting murder in the course of an attempted criminal assault. Suspicion of murder quickly turned towards petitioner and the police began to question him. They took him from the county jail to State Police Headquarters, where he was questioned by officers in relays from about 11:30 that night until sometime between 2:30 and 3 o'clock the following morning. The same procedure of persistent

The facts here to support a claim of denial of due process are not so convincing.

Certiorari was granted in this case because the record disclosed a serious charge under the Due Process Clause against Nebraska procedure in a criminal case. We have carefully weighed the circumstances of the petitioner's

interrogation from about 5:30 in the afternoon until about 3 o'clock the following morning, by a relay of six to eight officers, was pursued on Thursday the 13th, Friday the 14th, Saturday the 15th, Monday the 17th. Sunday was a day of rest from interrogation. About 3 o'clock on Tuesday morning, November 18, the petitioner made an incriminating statement after continuous questioning since 6 o'clock of the preceding evening. The statement did not satisfy the prosecutor who had been called in and he then took petitioner in hand. Petitioner, questioned by an interrogator of twenty years' experience as lawyer, judge and prosecutor, yielded a more incriminating document.

"Until his inculpatory statements were secured, the petitioner was a prisoner in the exclusive control of the prosecuting authorities. He was kept for the first two days in solitary confinement in a cell aptly enough called 'the hole' in view of its physical conditions as described by the State's witnesses. Apart from the five night sessions, the police intermittently interrogated Watts during the day and on three days drove him around town, hours at a time, with a view to eliciting identifications and other disclosures. Although the law of Indiana required that petitioner be given a prompt preliminary hearing before a magistrate, with all the protection a hearing was intended to give him, the petitioner was not only given no hearing during the entire period of interrogation but was without friendly or professional aid and without advice as to his constitutional rights. Disregard of rudimentary needs of life—opportunities for sleep and a decent allowance of food—are also relevant, not as aggravating elements of petitioner's treatment, but as part of the total situation out of which his confessions came and which stamped their character."

*Turner* v. *Pennsylvania,* 338 U. S. 62, 63–64:

"The officers making the arrest had no warrant and did not tell the petitioner why he was being arrested. These officers began to question the petitioner as soon as they reached the City Hall police station. One of them examined the petitioner for three hours on that afternoon and again that night from eight to eleven o'clock. From

lack of education and familiarity with our law, his experience and condition in life, his need for advice of counsel as to the law of homicide and the probable effect on such a man of interrogation during confinement. We have also taken into consideration Gallegos' uncontradicted testimony about his accommodations, his limited amounts of

time to time other officers joined in the interrogation. Petitioner persistently denied any knowledge of the murder.

"The next morning, June 4, the petitioner was booked on the police records as being held for questioning. Later that day he was questioned for about four hours more. On June 5 he was interrogated for another four hours and on the 6th for day and night sessions totaling six hours. The questioning was conducted sometimes by one officer and at other times by several working together; it appears, in fact, that whenever one of the police officers interested in the investigation had any free time he would have the petitioner brought from his cell for questioning.

"On June 7, the day when a confession was finally obtained, questioning began in the afternoon and continued for three hours. Later that day the officers who had been present during the afternoon returned with others to resume the examination of petitioner. Despite the fact that he was falsely told that other suspects had 'opened up' on him, petitioner repeatedly denied guilt. But finally, at about eleven o'clock, petitioner stated that he had killed the person for whose murder he was later arraigned.".

*Harris* v. *South Carolina,* 338 U. S. 68, 69–70:

"On Monday night questioning began in earnest. At least five officers worked in relays, relieving each other from time to time to permit respite from the stifling heat of the cubicle in which the interrogation was conducted. Throughout the evening petitioner denied that he had killed the Bennetts. On Tuesday the questioning continued under the same conditions from 1:30 in the afternoon until past one the following morning with only an hour's interval at 5:30. On Wednesday afternoon the Chief of the State Constabulary, with half a dozen of his men, questioned petitioner for about an hour, and the local authorities carried on the interrogation for three and a half hours longer. At 6:30 that evening the examination resumed. Petitioner continued to deny implication in the killings. The sheriff then threatened to arrest petitioner's mother for handling stolen property. Petitioner replied, 'Don't get my mother mixed up in

food and certain threats made by a Texas assistant sheriff not present at the trial. The uncertain character of this uncontradicted testimony, its lack of definiteness, and the action of the trial judge and jury lead us to place little weight upon it. Our position is confirmed by Gallegos' reiteration of his confession while in custody in Nebraska, when he charges no coercion except detention. See *Lyons* v. *Oklahoma*, 322 U. S. 596, 603.

We cannot say that Nebraska has here violated standards of decency or justice in this conviction.

*Affirmed.*

MR. JUSTICE MINTON took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON, whom MR. JUSTICE FRANKFURTER joins, concurring.

The State of Nebraska is the party that we have summoned to answer for state action claimed to violate the Fourteenth Amendment. I begin, therefore, by considering just what Nebraska itself has done that may be said to violate rights of the petitioner.

Nebraska authorities were not pursuing Gallegos. They did not know that murder had been done in that

---

it and I will tell you the truth.' Petitioner then stated in substance what appears in the confession introduced at the trial. The session ended at midnight.

"Petitioner was not informed of his rights under South Carolina law, such as the right to secure a lawyer, the right to request a preliminary hearing, or the right to remain silent. No preliminary hearing was ever given and his confession does not even contain the usual statement that he was told that what he said might be used against him. During the whole period of interrogation he was denied the benefit of consultation with family and friends and was surrounded by as many as a dozen members of a dominant group in positions of authority. It is relevant to note that Harris was an illiterate."

State and were under no pressure to pin guilt on some-
one. Gallegos, a Mexican illegally in this country, had
been a transient worker in Nebraska beet fields and had
with him a woman and two children. The whence and
whither of their comings and goings made no impression
on the community, and when they disappeared no one
asked how or why.

From Texas authorities, however, came word that a
Mexican, held there at request of the United States Immi-
gration and Naturalization Service, had confessed to mur-
dering his woman in Nebraska and had told where the
body was buried. Nebraska does not charge murder on
the basis of a confession without proof of the *corpus
delicti*, so the Nebraska officers—from information given
by Gallegos in Texas—found a grave and a decomposed
body ultimately identified as that of the woman who had
been living there with Gallegos without benefit of clergy.
Only after this discovery and identification were they in
a position to make a murder charge.

Gallegos was brought from Texas to Scotts Bluff
County, Nebraska. That was the first time he was in the
custody of Nebraska. There is not the slightest proof or
suggestion by the defendant or his counsel that Nebraska
officials abused, threatened, or unduly questioned him.
On the contrary, he willingly told how he beat his para-
mour to death in a fit of jealousy. The only complaint
against Nebraska is that it detained Gallegos an unduly
long time before arraignment. Even if it did, the delay
was *after* confession and therefore could not have been
for any sinister purpose of coercing one, nor could the
detention have been the cause of confession. There is
not, from any state action by Nebraska, the slightest
ground for inference that the confession to its officials
was not given voluntarily.

Upon the trial, however, the prosecution proved not
only the Nebraska confession but also an earlier one made

in Texas. In connection with the latter, vague allegations are made against the Texas officials. Perhaps the prosecution would have been well advised not to have proved how the murder originally came to light. But the prosecution chose to lay the whole matter before the jury, and had it failed to do so it would no doubt have been charged with some sinister purpose in its suppression.

Even if we should assume that Texas officials coerced this confession, they were not acting at the request of Nebraska nor in any sense as her agent. Before we could reverse the conviction, we would have to decide a question not heretofore answered in any decision that I recall, namely, whether Nebraska merely by admitting a coerced foreign confession in evidence would deny due process. Insofar as the reason for exclusion is to prevent convictions on coerced confessions, which are shown by legal experience to be intrinsically unreliable, I should suppose that any defect in its origin would inhere in the confession wherever offered. Insofar, however, as the reason for exclusion is to deter states from attempting coercion in order to bring about convictions, the reason would hardly apply to a case where a state of confession sought no conviction and the state of conviction did not seek the confession. But here there is no need to resolve such difficult questions in affirming the conviction, for I find no coercion such as would require exclusion of this confession, even if Nebraska be held to answer for the conduct of every official involved.

Gallegos was taken into custody by the Texas authorities at the request of the United States immigration service. They had probable cause to believe he was illegally in the country, as indeed he was, and I should not suppose his detention was illegal. The defendant himself does not claim that he was beaten, unduly questioned, or threatened, except that he was told he might be shipped

back to Mexico and turned over to the Mexican authorities—a statement which, if made, was patently true.

It should be borne in mind that the detaining officers did not know of this murder except that the immigration officials apparently had some information that the woman in the case had disappeared. The Texas authorities were not under pressure to solve a local murder. It is not even clear that they accused Gallegos of murder and certainly they had no theory of a crime which they were trying to support by obtaining a confession.

But "The guilty flee when no man pursueth." For three days, Gallegos refused to tell his name. But when he finally revealed his identity, he went on and told all. He may have been of the impression that the authorities who were holding him knew more than they did. Only the fact that he was in custody, the fear that his deeds were known, and the weight of the crime on his conscience can be said to have coerced this confession.

This defendant's trial appears to have been scrupulously fair and dispassionate. The jury and the Nebraska courts appear to have weighed all of the claims of Gallegos fairly and found, what I do not see how they could avoid finding, that the confessions were voluntary within the meaning of the law. These are not confessions obtained to fit the facts known to the officials. It is a case where the officials were directed to facts that fitted details of the confession. Nor is it a case where the confession was altered or embellished in a prolonged process of examination. The story first given to the authorities in Texas is substantially identical with that recited to the Nebraska authorities in greater detail.

Indeed no contention is brought to this Court that the confessions were in fact coerced or involuntary. The reason no such contention is made is that capable and zealous counsel cannot support them on this record. But the contention is that both confessions should be made inad-

missible in evidence because we should convert the so-called *McNabb* rule, a rule of evidence for federal courts, into a constitutional limitation upon the States. *McNabb v. United States,* 318 U. S. 332. The claim, and the only claim, is that because Gallegos was not arraigned by Texas immediately after arrest and again by Nebraska immediately after arrival in that State, each detention was illegal and the confessions, even if made without abuse or threat of it, but as a result of questioning during this detention, are inadmissible in evidence. The only "question presented" by the petition to this Court reads: "Are confessions of an accused obtained from him during a prolonged period of unlawful detention before he was brought before a magistrate and before a counsel was appointed to assist him, admissible in evidence?" Every one of the three specifications of error urged in petitioner's brief is based on "twenty-five days of unlawful detention" and on that alone.

Let us see what this would mean as applied to Texas. Texas made the arrest at the request of the immigration authorities and it is not denied that they had probable cause to believe he was an alien who had entered the country illegally. But, for three days he would not tell his name. I should not suppose the authorities were obliged to release an obvious alien so charged before they could learn his identity. Then he disclosed the murder. But the murder did not take place in Texas. That State obviously could not arraign him for it. Was it obliged to turn loose a confessed murderer because the murder occurred outside of their jurisdiction? It does not seem to me that to hold such a person without arraignment under these circumstances denies due process, unless due process prohibits society from taking common-sense steps to solve a murder.

But it is complained that Nebraska held him too long (just how long is too long we never are told) without arraignment. As I have pointed out, Nebraska knew nothing of the murder and had to conduct an investigation before it could make a properly supported charge of murder. Certainly due process does not require that charges be placed hurriedly and recklessly. Scotts Bluff County is a rural county with less than forty thousand inhabitants, more than half of whom are concentrated in two towns, the largest of which has a population of only twelve thousand. The small prosecuting staff that such a county would maintain cannot be expected to move with the speed of the Federal Government, with its many thousand agents and countless attorneys, or with the speed of big city police forces. What was there to hurry about? Gallegos had already confessed and he was not prejudiced by the delay. The authorities took their time drawing papers and getting proof of the *corpus delicti* in order. There seems to have been no passion or revenge at work in the case. A small prosecuting office in a town where life is leisurely made a simple effort to go about its duty with convenient speed.

Even if, as some members of the Court ardently desire, the *McNabb* rule were ever to be converted into a constitutional limitation upon the States, the facts in this case would afford a poor foundation for it. I concur in the affirmance.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

Americans justly complain when their fellow citizens in certain European countries are pounced upon at will by state police, held in jail incommunicado, and later convicted of crime on confessions obtained during such in-

carceration. Yet in part* upon just such a confession, this Court today affirms Nebraska's conviction of a citizen of Mexico who can neither read nor understand English.

The record shows the following facts without any dispute at all: While working in a field in El Paso County, Texas, on September 19, 1949, the petitioner was arrested by a local deputy sheriff without a warrant. The excuse given for the arrest was that immigration officers had requested it. No charge was ever filed against petitioner in any Texas state court nor was any warrant sworn out against him during the eight days he was kept in the Texas jail. His detention was incommunicado except for repeated questioning by the deputies. Part of the time petitioner was kept in an 8′ x 8′ cell with no windows, a cell which a Texas deputy testifying in this case referred to as the "dark room" or the "punishment room," although petitioner was a "docile prisoner" and did all he was told to do by the officers. It was during this incarceration of eight days that the petitioner gave a confession used to convict him in this case. As is usual in this type of case the deputies say that the confession was wholly "voluntary"; petitioner says that it was due to fear engendered by his incarceration and the actions of the deputies. Even if the officers' story should happen to be correct, I believe the Constitution forbids the use of confessions obtained by the kind of secret inquisition these deputies conducted.

There are countries where arbitrary arrests like this, followed by secret imprisonment and systematic question-

---

*During petitioner's trial an alleged confession made in Texas, an alleged confession made in Nebraska and a plea of guilty entered in a Nebraska court were introduced in evidence against him. His conviction should be reversed if any one of these three items of evidence were secured in violation of due process of law which the Federal Constitution guarantees. For this reason I consider the Texas confession only.

ing until confessions are obtained, are still recognized and permissible legal procedures. See "The Trap Closes" by Robert A. Vogeler with Leigh White, The Saturday Evening Post, November 3, 1951, p. 36 *et seq.* My own belief is that only by departure from the Constitution as properly interpreted can America tolerate such practices. See *Ashcraft* v. *Tennessee,* 322 U. S. 143, 154–155; *Chambers* v. *Florida,* 309 U. S. 227; *Bram* v. *United States,* 168 U. S. 532, 556, 562–563. I would reverse this judgment.