**UNITED STATES of America ex rel. Emil RECK, Relator-Appellant,**

v.

**Joseph E. RAGEN, Warden, Respondent-Appellee.**

**No. 12687.**

United States Court of Appeals
Seventh Circuit.

Jan. 13, 1960.

Duffy, Circuit Judge, dissented.

A. Bradley Eben, Bernard Weissbourd, Donald Page Moore, Richard A. Siegal, Chicago, Ill., for appellant.

William C. Wines, Chicago, Ill., Grenville Beardsley, Atty. Gen. of Illinois, Edward M. White, Asst. Atty. Gen., of counsel, for appellee.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This is an appeal from action [1] of the district court quashing a writ of habeas corpus which it had issued on the petition of Emil Reck, also referred to as "defendant", and remanding him to the custody of Joseph E. Ragen, appellee, warden of an Illinois state penitentiary.

In 1936 defendant was convicted of murder in the Criminal Court of Cook County, Illinois, and sentenced to a term of 199 years in said penitentiary, where he was accordingly imprisoned.

On the night of January 2, 1936, Dr. Silber C. Peacock, a Chicago physician, received a telephone call at his apartment. In answer to this call, he departed in his car with his instrument case. He did not return. The next evening his body was found on the floor of his parked automobile. He was dead from a bullet wound and 13 deep lacerations in his head. On Wednesday, March 25, 1936, the police arrested for bicycle theft, Reck, Durland Nash and Robert Goethe, all then 19 years of age, and Michael Livingston who was then 17 years of age.

[1]. Although no formal order was entered by the clerk, a notation was made of the filing of the judge's decision entitled Memorandum, Findings of Fact, Conclusions of Law and Decree; United States ex rel. Reck v. Ragen, D.C., 172 F.Supp. 734.

The following Saturday all four signed individual confessions of participation in the killing of Dr. Peacock. Nash and Goeth pleaded guilty and were sentenced to prison, while Reck and Livingston pleaded not guilty and were tried together, when their confessions were received in evidence over their objections. Both were sentenced to imprisonment. On writ of error, the Illinois Supreme Court, with the common law record before it, affirmed Reck's conviction, People v. Reck, 392 Ill. 311, 64 N.E.2d 526.

Proceeding under the Illinois Post-Conviction Hearing Act,[2] Reck filed a petition in the Criminal Court of Cook County, which was denied, which action was affirmed by the Illinois Supreme Court on November 23, 1955, 7 Ill.2d 261, 130 N.E.2d 200. That court summarized, 7 Ill.2d at page 262, 130 N.E.2d at page 201, the substance of the confessions signed by the four defendants, as follows:

"In the early evening of January 2, 1936, the four boys met and were riding in a Ford automobile driven by Jimmy Nash. They stopped at a Walgreen drug store somewhere on North Western Avenue. Robert Goeth and Nash got out of the car, went into the drug store, called Dr. Peacock and requested that he make a professional call on a sick child at 6438 North Whipple Street. The boys, while planning the robbery, had previously explored this neighborhood and found it to be dark and unfrequented. The two boys came back to the car and reported that their victim would be at the above address shortly, whereupon they drove there and parked their car nearby. Dr. Peacock arrived, parked his car in front of 6438, alighted from the car with his medicine case, and was approached by Robert Goeth who put a gun in his back and ordered him to re-enter his car, which he did. Livingston remained in the Ford and followed the doctor's car which was driven by Nash with Goeth sitting on his right and the petitioner [Reck] with the doctor in the rear seat. After they drove some distance they ordered the doctor out of his car and demanded his money. He said he didn't have any money and started fighting with Goeth. When Goeth got loose he fired two shots at the doctor, and while the doctor was lying on the ground breathing heavily, Reck finished killing him with a wooden club about one foot in length that he carried as a weapon. The boys searched the doctor's pockets and found $20, divided it equally, and left him lying on the floor of the rear seat of his car. Goeth also struck him several times with the butt of his gun while he was lying on the ground. After driving away the four separated and went their respective ways."

At page 264 of 7 Ill.2d, at page 202 of 130 N.E.2d, the court pointed out:

"It should be observed that petitioner throughout these proceedings has been represented by able and alert counsel. On the original trial a full hearing on the validity of the confession was had out of the presence of the jury. The trial judge ruled that the confession met all legal requirements. A similar hearing was had before the jury. The verdict of guilty and judgment thereon represent another determination that the confessions here under scrutiny did not emanate from coercion. * * *

" * * * The statements signed by the four boys are complete, detailed and consistent, which together with the circumstances surrounding their execution compel the conclusion that they represent the truth freely and voluntarily uttered.

"The record conclusively demonstrates that petitioner, Nash, Goeth and Livingston had been arrested

2. § 826 et seq., ch. 38, Ill.R.S.1951.

originally because of their suspected involvement in many robberies and burglaries. The first three days of their confinement was entirely devoted to their being questioned about crimes independent of the Peacock murder. For only twenty-four hours before the confessions were obtained were the boys asked about the instant homicide. We are of the opinion that petitioner's constitutional rights were not infringed under the facts as disclosed by the record in this case. * * *"

At the hearing on the writ in the district court, the complete records of proceedings in the Illinois courts were introduced. In this court Reck contends that the district court erred in its construction of the fourteenth amendment as applied to this case.

The only expert testimony dealing directly with the mental status of Reck is that of Dr. Harry R. Hoffman, director of the behavior clinic of the Criminal Court of Cook County, who was called as a witness for the defense. He reported that Reck had no nervous or mental disorder, that he was of dull normal intelligence, and was not committable as insane or feeble-minded; that he was never a juvenile delinquent.

An extensive effort has been made in the briefs in this court by Reck's counsel to establish that he was a weak character with a retarded mentality, evidently with the purpose of establishing a premise for a conclusion that his confession was extorted from him. For instance, it is argued that, as he dropped out of school at the age of 16 years, when he was in the seventh grade, and as he did not take part in athletic games, but was content to be a scorekeeper, he was a weakling. However, we note that, while he may have not been interested in books, he liked manual training. Although he did not participate in the spectacular features of athletic contests, he served an essential purpose when he kept the score.

We need not analyze in detail the further indications which counsel purport to find in the record pointing to an un-inspiring mentality in Reck. Undoubtedly he was no mental genius and was more apt to be classified as "inglorious", as Gray used the word in his benign reference to the many persons who make up a substantial and wholesome part of every population.

As to the evidence leading up to Reck's written confessions, the record shows that this group of four young men was in custody from *Wednesday*, March 25, 1936, to the following *Friday* night, during which time they were being questioned exclusively about thefts of bicycles, a saxophone, and other articles, and were being viewed by numerous victims of such crimes. They were still in custody when the following events occurred:

The first reference to the Peacock murder was made to Reck on Friday at 8:45 p. m. It was then that Captain Andrew Aiken, who was assigned to investigate mysterious telephone calls made to doctors in Chicago, viewed Reck at the police station and noticed that he matched a description previously given by an elderly doctor who had been the victim of a holdup. Aiken then accused Reck of the Peacock murder and Reck became ill. A doctor who was called to look at Reck said that he had a "nerve reaction". The police then caused Reck to be sent to the county hospital for the night, where he was picked up *Saturday morning*, and taken to a police station for questioning about the Peacock case. About 2 p. m. he was taken before Wilbert F. Crowley, first assistant state's attorney, who testified at the trial as to what occurred on *Saturday*, as follows:

"Crowley told Reck that Goeth and Nash (who had that morning confessed the crime) had said he was with them on the Peacock case. Reck denied being there, but admitted that he knew about it because Goeth had told him about it. Reck related in detail to Crowley what Goeth had said. Nash and Goeth were then brought before Crowley and identified Reck. Nash recited the details of the crime in Reck's presence and implicated him, where-

upon Reck said he did not do it. When asked, Goeth stated that Nash told the truth, admitting that he, Goeth, had hit the doctor with a gun and saying that Reck had hit him with a club. Whereupon Crowley asked, 'What about it, Reck'? and Goeth interrupted, saying, 'Go ahead, Emil, tell them the truth about it, you know you were there, and you know we are not lying about it.'

"Crowley said, 'What about it, Emil, were you there? Did you do those things?' Reck responded 'Well, I will tell you, I was there, I didn't hit him on the head.' He claimed Livingston hit the doctor."

It will be noted that this statement by Reck was made less than twenty-four hours after he was first asked about the Peacock murder by Captain Aiken.

Mr. Crowley then directed that Livingston be brought to confront Reck in regard to the latter statement and Mr. Crowley left to keep another appointment. When Crowley came back, a written statement had been prepared, and, in his presence, the four defendants signed but, before signing, the defendants watched copies, as Mr. Crowley read the statement aloud. At Reck's suggestion, an answer reading "my mother and two sisters", to a question "who do you live with?", was changed to read "my father and two sisters".

On the same day individual statements were taken from each defendant, as each was called in separately. These individual statements were signed after the defendants bathed and changed clothes. The signatures were affixed in the presence of a group of civilians, including the former foremen of several grand juries, various doctors and business men. Each statement was read aloud before it was signed and a copy was given to the signer.

The joint statement and the four individual statements were admitted in evidence, over objection.

Invoking the aid of the fourteenth amendment to the constitution of the United States, Reck now contends that his confessions were the product of coercion, citing his lengthy detention incommunicado and the illness which developed during that period of time. We are convinced, however, that the evidence proves that none of the treatment which he received while he was being detained prior to Saturday afternoon produced the confessions by Reck. While he had become ill when Captain Aiken on Friday night probingly accused him of the Peacock killing, his rugged determination to say nothing to reveal his involvement in that affair had prevented the authorities from obtaining any incriminatory admission from him in regard to that crime until Saturday afternoon in the office of the state's attorney. Until then, Reck, the strong man of the group, had stood fast and on this occasion it was only the realization that Goethe and Nash had confessed the Peacock killing and had implicated him, and had, in the presence of Crowley called upon Reck to tell "the truth about it, you know you were there, and you know we are not lying about it", that Reck realized that the "dance was over and the time had come to pay the fiddler". The latter words are quoted from Stein v. People of State of New York, 346 U.S. 156, 73 S. Ct. 1077, 97 L.Ed. 1522. In that case, 346 U.S. at page 186, 73 S.Ct. at page 1093, the court said:

" * * * Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary.

"Cooper's and Stein's confessions obviously came when they were convinced that their dance was over and the time had come to pay the fiddler. Even then, Cooper was so far in control of himself and the situation as to dictate the *quid pro quo* for which he would confess. That confession came at a time when he must have known that the police already knew

enough, from Jeppeson and Brassett, to make his implication inevitable. Stein held out until after Cooper had confessed and implicated him. Both confessions were 'voluntary,' in the only sense in which confessions to the police by one under arrest and suspicion ever are. The state courts could properly find an absence of psychological coercion."

To the same effect, see Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166, and Gallegos v. State of Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86.

We hold that Reck's confessions were voluntary and that the result reached by the district court was correct. Accordingly, the order from which the present appeal was taken is affirmed.

Affirmed.

DUFFY, Circuit Judge (dissenting).

Because the record before us discloses that Emil Reck's confessions were the product of psychological, if not physical, coercion, he was deprived of due process under the Fourteenth Amendment.

The majority opinion makes light of the claim that Reck had a retarded mentality, and reaches the amazing conclusion "Undoubtedly he was no mental genius and was more apt to be classified as 'inglorious' * * *." The opinion quotes Dr. Harry R. Hoffman, yet this doctor testified Reck, who was nineteen years old at the time of his arrest, had the intelligence of a child between ten and eleven years old.

Reck never had been arrested previously and was not a juvenile delinquent. He never had been a behavior problem at home or at school, but from early childhood, because of his mental retardation, he was studied recurrently by social agencies, psychologists and psychiatrists. At the age of twelve and a half it was estimated his mental age was eight, and his IQ was sixty-four. When he was tested again at the time he was nearly fifteen years of age, his mental age was found to be eight years and four months, and his IQ fifty-seven. Furthermore,

the District Court found as a fact that Reck was a mentally retarded boy. In my view, it is not a correct statement of the record to classify his condition as "inglorious."

I must also dissent from the statement in the majority opinion: "We are convinced, however, that the evidence proves that none of the treatment which he received while he was being detained prior to Saturday afternoon produced the confessions by Reck." At the time Reck signed the first confession, he had been in police custody about eighty hours. When he signed his second confession, he had been in police custody one hundred two hours and without solid food for at least forty-eight hours. The Supreme Court of Illinois described the situation by stating that Reck "was in custody of the police for a week, during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station and was twice taken to the hospital on a stretcher. During that week no formal charge was placed against petitioner and he was confined practically *incommunicado*." Reck v. People, 7 Ill.2d 261, 264, 130 N.E.2d 200, 202. This is the boy referred to in the majority opinion as "the strong man of the group."

The record discloses Reck was violently ill in the North Avenue Police Station four times the night before he confessed. He fainted repeatedly. He vomited blood and was unable to walk. While hospitalized, Reck recounted the details of police coercion to two physicians, but the doctors returned him to the tender ministrations of the police. Reck was not brought before a magistrate until the ninth day after his arrest without a warrant.

It is true the police examined Reck for three days about dozens of unrelated crimes ranging from bicycle theft to robbery, but this so-called "investigation" made a hospital case out of Reck. He had an entire physical collapse Friday night. Although his father twice attempted to visit him during the first several days of his confinement, he could

not do so, for Reck was being held *incommunicado*.

Applicable here are the decisions in Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 1357, 93 L.Ed. 1801; Turner v. Com. of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, and Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. The facts, reasoning and results in those five Supreme Court cases should dictate the result here. I believe that Emil Reck is entitled to a new trial because his confessions coerced by psychological pressures overwhelmed his limited powers of resistance.