**Clarence COLLINS, Petitioner,**

**v.**

**Dr. George J. BETO, Director, Texas Department of Corrections, Respondent.**

**Civ. A. No. 2922.**

United States District Court
S. D. Texas,
Galveston Division.

June 4, 1964.

William F. Walsh, Houston, Tex., for petitioner.

Waggoner Carr, Atty. Gen. of Texas, Austin, Tex., and Sam Robertson, Asst. Atty. Gen. of Texas, Houston, Tex., for respondent.

NOEL, District Judge.

Petitioner, Clarence Collins, is a prisoner at the Clemens Prison Farm, a unit of the Texas Department of Corrections located in Brazoria County, Texas, within this district and division. He complains in his application for writ of habeas corpus that his conviction of the offense of murder with malice aforethought in Criminal District Court No. 2 of Harris County, Texas, on December 2, 1960, was procured by the use of a confession obtained from him and introduced at his trial in violation of the right to due process of law guaranteed him by the Fourteenth Amendment to the United States Constitution, and that his consequent imprisonment is therefore unlawful.

The central question presented to this Court is whether the confession introduced against petitioner at his trial, viewed only through the eyes of federal law, was properly admitted in evidence. Petitioner appears properly to have exhausted his state remedies before turning here.

On November 16, 1959, Mrs. Wilma Selby was shot and killed in her Houston home. There were no witnesses. Several days later Mrs. Selby's husband, Joseph Selby, Sr., admitted to the Houston police that he had for some time been engaged in the business of finding someone to kill his wife. Mr. Selby's admissions implicated, among others, two negro women, Maggie Morgan and Patra Mae Bounds. Both admitted having been approached by Mr. Selby with the request that they find a killer, and they admitted having taken money from him but denied having successfully carried out a conspiracy. Joseph Selby, Sr., said he did not know who had been the killer.

In an effort to find the person who actually shot Mrs. Selby, the Houston police, the Sheriff's officers, the Texas Rangers, personnel of the District Attorney's office, and other persons interested in law enforcement began extensive investigations. Numerous persons were questioned in an effort by law enforcement officers to obtain information which would put them on the trail of the killer.

On December 12, 1959 the petitioner was taken into custody by the Houston police for questioning. Taken to the Houston police station, Collins was held until December 14, 1959, on which day he gave the police a statement saying he had once been approached by Maggie Morgan and asked to kill a white woman. He told police that he had refused to become involved in such a scheme and that he knew nothing more. After being given a lie detector test, he was released.

Then, on January 19, 1960 word was given to law enforcement officers which indicated that Collins had been the actual "triggerman." Collins was taken into custody that evening. On the morning

of January 21, 1960 Collins signed a statement in which he admitted having gone to the Selby home in the company of Maggie Morgan and Patra Mae Bounds and having there shot Mrs. Selby.

At Collins' trial, timely objection was made to the introduction of the statement on the grounds that it was involuntarily given and that it had been obtained while Collins was under illegal detention.

The trial judge appropriately heard evidence on the admissibility of the confession, out of the presence of the jury, and then, not finding it inadmissible, permitted the statement to be placed in evidence before the jury.

Properly instructed as to the applicable legal principles, the jury was left with the decision whether the statement had in fact been voluntarily made. Collins was found guilty of murder with malice aforethought and assessed punishment at ninety-nine years imprisonment.

Subsequently, Collins appealed his conviction to the Court of Criminal Appeals of Texas. That court affirmed in a written opinion, Collins v. State, 171 Tex.Cr. R. 585, 352 S.W.2d 841 (1961), finding no error in the admission of the confession. Petitioner was unsuccessful in his petition to the Supreme Court of the United States for writ of certiorari. Collins v. Texas, 369 U.S. 881, 82 S.Ct. 1152, 8 L.Ed.2d 283 (1962).

In his application for writ of habeas corpus Collins raises the following issues:

(1) whether certain evidentiary rulings by the trial court unconstitutionally prevented Collins from developing certain evidence considered by his counsel to be critical in the inquiry whether the incriminating statement had been voluntarily given,

(2) whether the statement was obtained while Collins was illegally in custody, and if so, whether it was not therefore inadmissible as a matter of law notwithstanding its voluntary or involuntary nature, and

(3) whether the confession was involuntary, the product of physical or psychological coercion.

Those allegations which deal with evidentiary rulings of the trial court are not of constitutional dimension. Although Collins was unable to introduce all of the evidence that he considered germane to the issue of the admissibility of his confession, he was given a real hearing. He did far more than merely tender the issue; over 700 pages of the statement of facts from the trial court are taken up by testimony and argument concerning the question whether Collins' statement was made voluntarily. Contrast Coleman v. State of Alabama, 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190 (May 4, 1964).

For support of his argument that a confession obtained during a period of unlawful detention is, without more, constitutionally inadmissible, Collins turns to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In that case the Supreme Court enunciated the rule that evidence obtained through unconstitutional searches and seizures is inadmissible in a state court. Petitioner suggests that an incriminating statement from one in unlawful police custody should be considered to fall within the Mapp exclusion, as "fruit" of official illegality; for that proposition he cites the recent decisions of the Supreme Court in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and of the Court of Appeals for the District of Columbia in Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963).

The Wong Sun and Gatlin cases did indeed hold inadmissible the incriminating statements obtained from defendants while under illegal arrest, but both cases dealt with federal convictions, and both decisions appear to have been largely, if not entirely, governed by the federal evidentiary principles which find their genesis in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). In McNabb the Court held to be erroneous the introduction in a federal court of a confession obtained from one who, in disregard of the requirements of the federal statutes, had not been taken

before a committing officer immediately after his arrest. But that rule has been repeatedly and emphatically characterized as a mere evidentiary rule for the federal courts, drawn under the supervisory powers of the Supreme Court, and of far less than constitutional force. See, e. g., Stein v. People of State of New York, 346 U.S. 156, 187–188, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Gallegos v. State of Nebraska, 342 U.S. 55, 63–64, 72 S.Ct. 141, 96 L.Ed. 86 (1951).

In its decision in Culombe v. Connecticut, 367 U.S. 568, 599–601, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), handed down the same day as Mapp, the Supreme Court reiterated its view that the McNabb rule had not been extended to state prosecutions. Following that view, the Court of Appeals for the Fifth Circuit has recently held in Young v. Wainwright, 326 F.2d 255 (5th Cir. 1964), that the admission in a state criminal prosecution of a confession not otherwise involuntarily given, which had been obtained from one under arrest without a warrant, who had not been advised of his constitutional rights, and who had not been taken immediately before a committing magistrate, was not a denial of due process.

Thus, assuming the petitioner is correct in alleging that his confession was obtained while he was unlawfully in custody, he had not, without more, established its inadmissibility.

Collins' main contention is that the confession admitted at his trial was involuntary, being the product of physical or psychological coercion. Petitioner thus alleges a serious violation of his Fourteenth Amendment guaranty of due process.

At the state trial, Collins' counsel very capably placed in issue the voluntariness *vel non* of the confession. An abundant record was made on the issue. On that record the jury and the Court of Criminal Appeals of Texas made their decisions, the Court of Criminal Appeals expressly finding the confession to be admissible. Collins v. State, 171 Tex.Cr.R. 585, 352 S.W.2d 841 (1961).

This Court has had no doubt that the procedures employed by the state courts to find the operative facts were fairly designed to accomplish that purpose and were applied in this case in such a way that the basic facts were reliably found. But the Court has been mindful that the issue raised here opens wide the gates to innuendo, and that review of a cold, printed record leaves much to be desired where credibility of witnesses is sharply at issue. Thus, feeling that the serious nature of Collins' charges made appropriate a full and complete evidentiary consideration, this Court, in the exercise of its powers delineated in Fay v. Noia, 372 U.S. 391, 422–423, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), ordered a plenary hearing.

At that hearing, which lasted four days, Collins was given full opportunity to present his evidence, some of which, of questionable admissibility, had been refused at the state trial. Notably, in order that the Court's efforts to determine credibility would be as little hampered as possible, petitioner himself was allowed to testify at length concerning his view of the circumstances surrounding the taking of his statement. Petitioner did not take the stand in the state court. In addition to Collins, twenty-four witnesses gave testimony at the plenary hearing.

At the conclusion of the hearing, the Court requested counsel to submit extensive evidentiary briefs, referring to the entire record: the transcript and statement of facts from the state court, the record in the plenary hearing before this Court, and, of course, all exhibits. The Court has received the briefs and has carefully reviewed the entire record.

The constitutional admissibility of confessions in state criminal prosecutions is a subject with which the United States Supreme Court has dealt extensively. Beginning with the decision in Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), in which due process was held to be violated by a state criminal conviction bottomed

on a confession obtained by physical torture, a long line of cases has established standards for constitutionally measuring the admission of confessions in evidence. Recently, the Supreme Court reiterated those standards in Townsend v. Sain, 372 U.S. 293, 307–309, 83 S.Ct. 745, 754, 9 L. Ed.2d 770 (1963):

> "If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure * * *. Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible." (Footnotes omitted.)

Thus, of course, a confession made concurrently with physical violence or threat of brutality is not voluntary, Stein v. People of State of New York, 346 U.S. 156, 182, 73 S.Ct 1077, 97 L.Ed. 1522 (1953). Nor is a confession voluntary if induced by promises of reward or immunity, Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

In light of the criteria delineated by the Supreme Court, there are in this case three fact issues which are germane to the question whether Collins' confession was voluntarily made: whether there was physical coercion, whether there were promises of leniency or special treatment which drew out the confession, and whether all of the circumstances surrounding the giving of the confession were such as to amount to psychological coercion.

The first two of these issues were raised by Collins' testimony before this Court in the plenary hearing. They were not raised in the state trial where Collins did not take the stand.

Collins claims to have been severely beaten by a number of law enforcement officers in the early morning hours of January 20, 1960. He had been arrested several hours earlier, on the evening of January 19th, and at the time he says he was beaten he was being held in the county jail at Humble, Texas, a small community on the outskirts of Houston. His confession was given to the authorities more than twenty-four hours later.

Collins also claims that on several other occasions he was kicked or slapped, and that during the interrogation which led to his confession he was promised that upon confessing he would be given a ticket to California so that he could go there and live with his brother.

■ Having heard the testimony of all of the witnesses, and having observed Collins upon the witness stand and carefully evaluated his credibility, the Court is absolutely convinced that there is no truth to these assertions. Each of the persons accused by Collins was put on the stand; each one forthrightly explained his part in the arrest and interrogation of Collins and, unshaken by cross-examination, denied Collins' accusations. Color photographs taken of Collins' body after his confession and arraignment, although taken only slightly more than a day after Collins claims to have been viciously beaten, show no skin discolorations, bruises, abrasions, scratches, or other marks of violence. Immediately after having been arraigned on the morning of January 21st, Collins was interviewed by numerous reporters; to them he said he had not been mistreated. A number of those newsmen testified at the hearing before this Court; none of them noted having observed signs that Collins had been abused.

■■ Perhaps more difficult, because of the very nature of the inquiry, is the question whether all the circumstances surrounding the giving of the confession combined to amount to psychological coercion. The cases are legion in which the process of interrogation was found to be so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession. But, as the Supreme Court said

in Stein v. People of State of New York, 346 U.S. 156, 184, 73 S.Ct. 1077, 1092 (1953),

"Interrogation is not inherently coercive, as is physical violence. Interrogation does have social value in solving crime, as physical force does not. By their own answers many suspects clear themselves, and the information they give frequently points out another who is guilty. Indeed, interrogation of those who know something about the facts is the chief means to solution of crime. The duty to disclose knowledge of crime rests upon all citizens. * * * This Court never has held that the Fourteenth Amendment prohibits a state from such detention and interrogation of a suspect as under the circumstances appears reasonable and not coercive."

We must therefore consider in some detail the facts surrounding the giving of the confession.

Collins was first taken into custody by two negro officers at the home of Maggie Morgan, one of the negro women who had been implicated by Mr. Selby in his admissions to the police, at approximately 8:30 p. m. on December 12, 1959. He was taken to the Houston police station, questioned for a short while, and placed in jail. Apparently, there was no questioning on the next day, December 13th. On December 14th Collins was questioned for twenty or thirty minutes and made a statement, in the form of a witness affidavit, in which he explained that during the latter part of October 1959, he had been asked by Maggie Morgan if he would like to make some quick money by "bumping someone off." He said that he told her he was not that type of person, and that Morgan had never again mentioned to him anything about killing anyone. After being given four polygraph examinations, Collins was released at 6:00 p. m., December 14, 1959, with no charges being filed against him.

During the afternoon of January 19, 1960, law enforcement officials were given information which indicated that Collins might have been Mrs. Selby's killer. In order that he might be questioned further, petitioner was again taken into custody, at his home, by three negro officers, around 7:30 p. m. on January 19, 1960. He was taken to the Texas Ranger Headquarters in Houston, where he remained until midnight. During this time Collins was engaged in conversation "on and off" by several of the officers who were present in the building, but there appears to have been no serious, pressing questioning.

At approximately midnight, Collins was taken by a Sheriff's officer to the jail maintained by the county at Humble, Texas, a small community on the outskirts of Houston and some ten or twelve miles from the Ranger headquarters.

Around 2:30 p. m. the following afternoon, January 20, 1960, three negro officers went to the Humble jail and picked Collins up to return him to the Ranger headquarters. On the way the officers and Collins stopped at a diner, went in, and the officers had lunch. Collins was offered food but declined anything but a soft drink, saying he had just finished two hamburgers before they had picked him up at the jail. Collins was not handcuffed, and apparently the luncheon was leisurely. There was little, if any, discussion of the Selby case. After eating, the officers attended to some personal matters, and the four arrived at Ranger headquarters about 5:00 p. m.

No one conversed with Collins prior to the arrival of Captain Waycott, chief of the Houston police homicide division. Beginning around 7:00 p. m., Captain Waycott questioned petitioner for approximately thirty minutes. Subsequently, the three negro officers who had been with Collins earlier in the afternoon talked with him about the Selby case for a little more than an hour.

Collins then reminded one of the negro officers that seven or eight years earlier the officer had helped clear Collins of some false accusation, and said "I want to tell you all about it." At that time Collins made an oral statement to the officer, who called in Captain Waycott and

Chief Frazier, of the Sheriff's office. Collins repeated his account to them.

Then, at about 9:00 p. m., Officer Baker, of the Houston police department, was left with Collins and talked with him about forty-five minutes. After being warned by Officer Baker that he need not make a statement, that if he chose to make a statement it had to be voluntary, and that any statement made could be used against him, Collins gave to Officer Baker a detailed statement which took about two hours to reduce to writing. It was finished about midnight and Collins signed it. In the statement, Collins told that he had gone to the Selby house the night of the murder, with Maggie Morgan and another negro woman named Johnson. Collins claimed to have remained outside in the car while Maggie Morgan went into the house and killed Mrs. Selby, although Collins claimed not to have known at the time what Morgan was doing.

Because of Collins' statement, a negro woman named Veronia Johnson was brought to the Ranger headquarters and questioned. As a result of that questioning, and because their other information did not coincide with some of the matters contained in Collins' statement, the officers expressed to Collins their belief that he had not told the entire truth. At Collins' request, he was then given a lie detector test, or polygraph examination, of the same nature as the one that had been given him the previous December. That test began about 1:25 a. m., January 21st, and lasted from six to eight minutes. After a thirty-minute rest period, another six to eight-minute polygraph examination was given to petitioner, beginning at 2:05 a. m.

Convinced that Collins' statement was not wholly truthful, Officer Baker began questioning Collins again at 3:15 a. m. Shortly thereafter, Collins confessed to the crime in the presence of Officer Baker, Captain Waycott, and Chief Frazier. At 4:30 a. m., Captain Waycott filed murder charges against Collins and telephoned a justice of the peace in order to obtain an arrest warrant. At about the same time,

after giving Collins a warning similar to that given before the taking of the first statement, Officer Baker took down the second detailed statement, the confession introduced at Collins' trial. This second statement, in narrative form and in Collins' own words, took almost two and one-half hours to transcribe, and was completed at 7:00 a. m. At that time, Collins read and signed the statement.

Petitioner was then taken to the Houston police station where he was fed and where a record of his arrest was made. He was then taken before Justice of the Peace Ragan and formally charged, at approximately 9:00 a. m. Shortly thereafter, he was interviewed by members of the press and he admitted that he had killed Mrs. Selby. At that time, in answer to questions from the newsmen, Collins denied that he had been mistreated in any way by the police. The newsmen, a number of whom testified at the hearing before this Court, observing that Collins was relaxed and at ease during the interview, made no note of any signs of his having been physically abused. Only in the late afternoon of the same day, after petitioner had spent hours in jail and decided to change his story, did he tell newsmen that he had unwillingly signed his confession, apparently, although the evidence indicates his story was somewhat incoherent, because he had been whipped and had been scared.

At the time of these happenings, Collins was twenty-three years old. He had been working as a longshoreman and looking out for himself since he was about fifteen. He had gone to the low fifth grade in school, and there is no indication that he was illiterate.

A psychiatrist and a psychologist, testifying in behalf of petitioner, stated that he was of low intelligence, although not mentally defective, and that they felt he had a low ability to withstand stress.

When presented with a hypothetical question embodying petitioner's extreme view of the facts, including the assumption that Collins had been subjected to twelve to thirteen hours of intense ques-

tioning, the psychiatrist expressed an opinion that Collins' confession would probably not have been the result of free choice. On cross-examination, the psychiatrist explained that essential to his conclusion was the *assumption* that Collins had been subjected to long periods of high-pressure questioning. And when presented by counsel for the respondent with a hypothetical question embodying facts very similar to those which the Court finds to have existed, the psychiatrist was of the opinion that the emotional pressure on Collins probably would not have been sufficient to interfere with the exercise of his free will.

In his pleadings and briefs, petitioner's very capable counsel has skillfully employed innuendo in an attempt to paint a picture of coercion. One of the facts which is alleged to show that Collins was the object of a vicious coercive scheme is that he was arrested without a warrant. Whether such action was appropriate is not the question before this Court. Our inquiry is limited to measuring the coercive effect of the absence of a warrant. There is no evidence that Collins ever asked if a warrant had been issued, or that there was the slightest force used by police in taking him into custody. Further, the implication is that arrests for questioning, such as were Collins' both in December and January, are not commonly based on warrants, legally or not.

Likewise, the fact that Collins was questioned at Ranger headquarters rather than at the Houston police station or the Harris County Sheriff's office, and the fact that he was confined in the jail in the county building in Humble, pictures of the interior of which were introduced in evidence, rather than at the city or downtown county jail, are pointed to as evidence of a coercive scheme. But the evidence is that there were several suspects who later became defendants in this case, and that the officers were attempting to conduct their investigation of each one independently of the others.

The evidence also shows that the various news media had reporters regularly assigned to the Houston police station and to the Harris County Criminal Courts Building, where the Sheriff's offices are located, but that there were no reporters assigned to the Texas Ranger Headquarters. Therefore, the officers explained, they could better conduct their questioning at the Ranger headquarters, because they did not desire that their progress in the investigation of the case be relayed to the other suspects prior to the time they were able to devote their attentions to such other suspects. This, likewise, was the reason given for the placing of petitioner in the nearby Humble branch of the county jail overnight.

Petitioner's counsel also argues that the lie detector tests given Collins immediately prior to his confession were given him to cause fright. That contention carries little weight in view of the fact that Collins himself requested the tests.

Collins' counsel points out that Collins received no visitors during his confinement and that he did not consult with an attorney prior to signing the confession. But there is not the slightest bit of evidence that Collins ever requested to see anyone, family, friends, or attorney, and there is also no evidence that anyone requested and was denied the right to see him.

Having heard the testimony of all the participants, having carefully reviewed the record in the state court, having considered the pleadings, having given particular attention to Collins' contention that the combination of all the factors accompanying his statement caused his will to be overborne, and having given full consideration to the character and power of resistance of the petitioner, the Court is convinced that the circumstances surrounding the giving of the confession were neither unreasonable nor coercive.

This Court therefore finds that the confession introduced at petitioner's trial was voluntary, the product of a free will,

and that no violation of petitioner's Fourteenth Amendment guaranty of due process is present in his state conviction.

The petition for writ of habeas corpus is therefore denied.